[Civ. No. 25793. First Dist., Div. One. Oct. 28, 1970.]

WARREN V. GLASS, JR., et al.,
Plaintiffs, Cross-defendants and Respondents, v.
GULF OIL CORPORATION et al.,
Defendants, Cross-complainants and Appellants.

416

---

COUNSEL

Bagley, Bianchi & Sheeks and Joseph E. Sheeks for Defendants, Cross-complainants and Appellants.

A. Leonard Bjorklund, Jr., for Plaintiffs, Cross-defendants and Respondents.

---

OPINION

SIMS, J.—[1]Defendants Gulf Oil Corporation, a property owner, and the Frouge Corporation, the developer of its codefendants' property, have ap-

---

[1]This opinion was initially filed on September 2, 1970. A petition for rehearing was granted on October 1, 1970 for the purpose of considering an award of attorneys' fees on appeal. Counsel have stipulated that the issue of attorneys' fees on appeal has been settled and that the opinion may be refiled in its original form.

pealed from a judgment which awarded the plaintiffs Glass, neighboring property owners, general and exemplary damages aggregating $11,500 for slander of title, together with attorneys' fees and costs, and which enjoined and restrained the defendants from trespassing on plaintiffs' property and from publishing any information which would indicate that plaintiffs' land was other than private property. ■■■ The judgment is predicated upon plaintiffs' claim that the defendants falsely represented that plaintiffs' private road and adjacent property would be available as and would provide an access road to a vast housing development planned by the defendants on 2,100 acres lying to the west of the plaintiffs' property.

The defendants contend (I) that the evidence is insufficient to sustain the charge of slander of title because it fails to show (a) that the defendants made any false statements concerning the plaintiffs' property, (b) that the defendants disparaged plaintiffs' title, (c) that the plaintiffs' title encompassed the interest which is the subject of the alleged slander and (d) that the plaintiffs sustained any damage. Complimentary to the foregoing, they assert that the evidence shows as a matter of law (II) that the plaintiffs' property is subject to easements of record which may be used by defendants and others, (III) that the easement in question was dedicated to public use by adverse user, and (IV) that the defendants acquired an implied easement over plaintiffs' property by reason of an easement over an adjacent portion of the roadway which had been conveyed to their predecessor in title. All of the foregoing issues were resolved against the defendants by the verdicts, general and special, of the jury, and by the findings of the court. Examination of the record indicates that the findings of the jury and the court are supported by sufficient evidence, and so must be sustained on appeal. (*Green Tree Enterprises, Inc.* v. *Palm Springs Alpine Estates, Inc.* (1967) 66 Cal.2d 782, 784-785 [59 Cal.Rptr. 141, 427 P.2d 805].)

Defendants' further contentions that recovery is barred (V) because the plaintiffs were guilty of laches, and (VI) because they failed to come into court with clean hands are also found to be without merit. The attack (VII) on the award of punitive damages because the jury resorted to lot or chance is unsustainable. The court's (VIII) award of attorneys' fees and (IX) its order refusing to strike certain costs claimed by plaintiffs are reviewed, and it is determined that the trial court did not abuse its discretion in including the award and the costs in the judgment.

## Statement of Facts and Prior Proceedings

Plaintiffs, Warren and Ida Lou Glass, husband and wife, purchased certain unimproved property in the County of Marin, in 1947. The land is located in an area known as Wolfback Ridge, in Sausalito. Their home

is located on a portion of the acreage overlooking Highway 101 at the top of the Waldo Grade, at the western end of the Spencer Avenue overpass; the remainder of their land is unimproved.

Prior to the time the highway became a divided freeway, Spencer Avenue intersected the highway. On the west side of the highway, upper Spencer Avenue (that portion at issue at the trial) climbed Wolfback Ridge as a narrow, winding road, which passed and passes the Glass residence; that portion of Spencer Avenue in the vicinity of respondents' residence is known as "Wolfback Ridge Road" or simply "Ridge Road"; it is now reached by an overpass which crosses Highway 101 at the top of the Waldo Grade. Ridge Road serves as access to plaintiffs' property and to other homes in the area; approximately 770 feet of the road was found to be owned by plaintiffs; the remainder of the footage in the area is owned by other property owners.

To the west of plaintiffs' property, defendants Gulf Oil Corporation and Frouge Corporation, planned to develop certain lands into a self-contained city to be known as "Marincello," a city capable of housing and serving a population of from 20,000 to 30,000.

In March 1965, defendants filed their master plan for the Marincello project with the Marin County Planning Commission. The contents of the plan were disclosed to the public at the first planning commission meeting relating to that matter on June 7, 1965. A model of the Marincello project had been on display, however, at least since November 1964, at the defendants' business offices in Sausalito. The model which was quite large, and appeared to be accurate, could be seen by members of the public.

The model and master plan for Marincello appeared to depict plaintiffs' road and adjacent property as providing and being available to the public as a major access route, apparently (being on the same scale as the other major access routes) some 80 feet in width. Additionally, similar representations were made by defendants' representatives at meetings of the planning commission on June 7 and June 21, 1965; by photographs and depictions which had been distributed and published; and by radio broadcasts. Plaintiff Warren Glass claimed that he attempted to have defendants correct their representations, but that the effort was futile.

On June 17, 1965, plaintiffs filed a complaint, requesting damages for slander of title and also requesting injunctive relief prohibiting further false representations. They alleged that defendants had falsely represented that plaintiffs' private road and adjacent property would provide and be avail-

able as a major access road to the housing development planned by defendants. Defendants, in their answer and cross-complaint, asserted easement rights in the road, both public and private, and also sought to quiet title to their alleged interest in the road.

A court hearing, regarding the issuance of a preliminary injunction, was held August 20, 1965, through August 26, 1965. At the conclusion of the hearing, the court granted plaintiffs a preliminary injunction enjoining defendants from representing plaintiffs' road as being of a width in excess of its actual width on the ground.

A jury trial of this action commenced April 18, 1967, and lasted 12 days. A court trial of the issues raised by defendants' cross-complaint followed the jury trial.

The jury found for the plaintiffs in the sum of $11,500. In special interrogatories the jury found that plaintiffs' portion of the road in question had not been dedicated for public use; that defendants had made and published false and unprivileged statements and representations regarding plaintiffs' property; that the statements and representations resulted in pecuniary loss to plaintiffs; and that plaintiffs were also entitled to exemplary (also referred to as "punitive") damages.

On the cross-complaint and the additional issue of attorneys' fees, the court found in favor of plaintiffs; finally, the court entered a permanent injunction against defendants, enjoining them from making any further false representations respecting plaintiffs' road and also from trespassing on that road.

Other facts and procedural rulings are set forth below where pertinent.

## I.

Both sides acknowledge that the requisites for a cause of action for slander of title are correctly set forth in section 624 of the Restatement of Torts as follows: "One who, without a privilege to do so, publishes matter which is untrue and disparaging to another's property in land, chattels or intangible things under such circumstances as would lead a reasonable man to foresee that the conduct of a third person as purchaser or lessee thereof might be determined thereby is liable for pecuniary loss resulting to the other from the impairment of vendibility thus caused.[1a]" (See *Gudger* v.

[1a]The court's instructions on slander of title included the following: ". . . I instruct you that one who, without a privilege to do so, publishes matter which is untrue and disparaging to another's property *and* land, under such circumstances as would lead a reasonable man to foresee that the conduct of a third person as the purchaser thereof might be determined thereby is liable for pecuniary loss resulting to the other

*Manton* (1943) 21 Cal.2d 537, 541 [134 P.2d 217], disapproved on another issue, *Albertson* v. *Raboff* (1956) 46 Cal.2d 375, 381 [295 P.2d 405]; *Cavin Memorial Corp.* v. *Requa* (1970) 5 Cal.App.3d 345, 361 [85 Cal.Rptr. 107]; *Spencer* v. *Harmon Enterprises, Inc.* (1965) 234 Cal. App.2d 614, 622 [44 Cal.Rptr. 683]; *Phillips* v. *Glazer* (1949) 94 Cal. App.2d 673, 677 [211 P.2d 37]; *Davis* v. *Wood* (1943) 61 Cal.App.2d 788, 797 [143 P.2d 740]; and 2 Witkin, Summary of Cal. Law (1960) Torts, § 130, p. 1302.)

*Falsity*

The court instructed the jury that the first question for them to determine was whether the plaintiffs had dedicated their portion of the Wolfback Ridge Road for public use. After an exposition of the law relating to that subject (see discussion III, *infra*), the court introduced the question of slander of title by reference to two theories, first, that the defendants claimed a right to use a roadway which was not dedicated to the public, or second, that the defendants claimed a right to a use which was not consistent with the use arising from the public's adverse user. These theories were embodied in separate forms of verdicts submitted to the jury and were supplemented by specific interrogatories.

The jury in its answer to one of the interrogatories and by its selection of the form of verdict expressly indicated that the plaintiffs' portion of Wolfback Ridge Road had not been dedicated for public use. The court had already charged the jury as follows: "One issue you do not have to determine is that of record title. This is a matter of law for the Court to decide. Accordingly, I instruct you that the plaintiffs hold record title to that portion of Wolf Back Ridge which is in issue here and that neither plaintiffs nor their predecessors have by formal conveyance given to the public or the defendants an easement or right-of-way to said portion of Wolf Back Ridge Road." (See discussion II and IV, *infra*.) The issue of falsity was resolved by the jurors' affirmative answer to the following interrogatory, "Have the defendants made and published false and unprivileged statements and representations respecting plaintiffs' property?"

Evidence of the following facts sustains that finding:

The model prepared by defendants and housed at their offices in Sausalito was approximately 20 feet by 20 feet in size. It was enclosed in a glass case approximately 10 to 13 feet in height, and was surrounded by a ramp from which it could be viewed from above. It purported to display all facets of the project to scale. It showed an access road over the prop-

---

from the impairment of vendability thus caused." (Italics added.) No attack has been made on this or other instructions (see fn. 6, *infra*) concerning the same subject.

erty in question to the Spencer Avenue overpass of the width, to scale, equivalent to that shown for access to the north through Tennessee Valley, and to the northeast over Rodeo Avenue. It did not show plaintiffs' home, or the actual size of the existing easement. Large maps which portrayed various aspects of the project were prepared, and as reduced in size were included in a master plan booklet filed with the Marin County Planning Commission March 22, 1965. These maps similarly represented the situation concerning the access over plaintiffs' property; and by scale depicted a road 80 feet wide. The booklet, however, recited, "There will be two major access routes to Marincello . . . Rodeo Avenue . . . [and] . . . Tennessee Valley. . . .

"Although Spencer Avenue lies between the Waldo Tunnel and Rodeo Avenue, it is not planned that Spencer Avenue shall provide any major access to Marincello. Future plans of the State Division of Highways do not include an interchange at Spencer Avenue but do include an interchange at Rodeo Avenue. Furthermore, the General Plan of the City of Sausalito is in accord with the plans of the Division of Highways and designates Rodeo Avenue as a major access to that city. Consequently, although Spencer Avenue will intersect the internal circulation system of Marincello at the Marincello ridge line, it will not provide primary access and will presumably be retained as a two-lane, minor access road. This conclusion is further dictated by the fact that there are no known plans of any public agency to provide direct southbound access from Spencer Avenue to the Redwood Highway."

There is also evidence to show that the large maps and photographs of the model were exhibited at meetings of the Marin County Planning Commission on June 7 and 21, 1965; and that during the oral presentation by defendants' representatives it was stated that the road in question would be available as an access to the project. In a radio broadcast June 22, 1965, the architect for the project said, "There were generally three entrances planned to the project. One at the existing Spencer Avenue, another at Rodeo, and another one from the Tennessee Valley area. These three entrances are proposed for development to handle the project."[2] The project received wide press coverage. The evidence revealed that a photograph of the model which showed access to Spencer Avenue appeared in two

[2]In addition, the following colloquy occurred: [Q] "Mr. Reid, if they are going to go over Spencer Avenue at Wolf Back Ridge, how about the little property owner who already has established his home on 20-acre plots in this area? MR. REID: I do not quite get the connection between the question and the property owner. I do not know whether property will have to be taken over to enlarge the road or not. I am not aware of that. But it seems to me that there are at present—there is at present enough of a right-of-way and a two-lane road across there which was all that was contemplated. Spencer Avenue was not to be enlarged."

newspapers. In a report to the planning commission setting forth the general costs of the development, the defendants' representatives included the costs of improving the road over plaintiffs' property to a paved width of 40 feet to permit access to the project.

The defendants seek to avoid the thrust of this evidence by categorizing their statements and graphic representations as mere symbolic proposals which suggest ways to plan access to the development. They also emphasize the testimony of their architect and of their engineer to the effect that the scale on the maps was not meaningful, but that in accordance with the text of the master plan, and in confirmation with the two-lane width of the existing overpass, a 20-foot roadway on a 28-foot right of way is all that anyone could reasonably believe was contemplated for access over plaintiffs' property. Nevertheless the defendants, despite plaintiffs' protestations, never to this day have receded from the position that they have a right to such minor access over plaintiffs' property. As is pointed out below, the jury and the court properly found that the representation inherent in that claim was false.[3]

---

[3]Reference to defendants' claim necessitates mention of an issue which was not developed by either party at the trial or before this court. By definition slander of title involves an absence of a privilege to publish the false and disparaging matter of which complaint is made. (See Rest., Torts, § 624.) Section 647 of the Restatement of Torts provides, "A rival claimant is privileged to disparage another's property in land, chattels or intangible things by an honest assertion of an inconsistent legally protected interest in himself." (See *Gudger* v. *Manton, supra,* 21 Cal.2d 537, 548-549; *Cavin Memorial Corp.* v. *Requa, supra,* 3 Cal.App.3d 345, 361; *Spencer* v. *Harmon Enterprises, Inc., supra,* 234 Cal.App.2d 614, 622; and *Davis* v. *Wood, supra,* 61 Cal. App.2d 788, 794.) Although the instructions given refer to "unprivileged disparagement" and to "one who, without a privilege to do so, publishes matter," etc. no instructions on the subject of privilege were given, nor, in fact, do any instructions on the subject appear in the instructions requested but refused by the court (which were requested to be and have been included in the clerk's transcript). This oversight may well be due to plaintiffs' concentration on attempting to prove the allegations, among others in their complaint, that "[s]aid maps picture said major arterial highway as being 80′ wide, which width is over twice the size of said private road as it now exists, and which representation, if believed, would mean that plaintiffs' residence was to be demolished"; and on defendants' part may have been occasioned by their paramount interest in establishing the easement claimed in their cross-complaint.

The omission, however, is not fatal to the judgment. "The trial court need not of its own motion give special instructions in the absence of a request therefor by counsel." (*Ornales* v. *Wiggins* (1950) 35 Cal.2d 474, 479 [218 P.2d 531] [disapproved on other grounds, *Alarid* v. *Vanier* (1958) 50 Cal.2d 617, 624 [327 P.2d 897]]. See also *Gaspar* v. *Georgia Pac. Corp.* (1967) 248 Cal.App.2d 248, 251 [56 Cal.Rptr. 243]; and *Mula* v. *Meyer* (1955) 132 Cal.App.2d 279, 286 [282 P.2d 107]. Cf. *Pedesky* v. *Bleiberg* (1967) 251 Cal.App.2d 119, 124 [59 Cal.Rptr. 294]; and *Thomas* v. *Buttress & McClellan, Inc.* (1956) 141 Cal.App.2d 812, 819-820 [297 P.2d 768].) Moreover, the privilege only exists where the representations are made in good faith, and it cannot be asserted where there is actual or implied malice. (See *Gudger* v. *Manton, supra,* 21 Cal.2d 537, 546-547; *Spencer* v. *Harmon Enterprises, Inc., supra,* 234 Cal.

In justification defendants refer to a Marin County streets and highways plan which delineated a roadway through the plaintiffs' property. It appears, however, that the roadway west of the overpass was not shown in any of the colors used to designate existing public roads. This argument in justification (cf. *Cavin Memorial Corp.* v. *Requa, supra,* 5 Cal.App.3d 345, 361) highlights the shortcoming underlying defendants' argument that there was no false representation in a mere plan. The evidence does not compel as a matter of law a finding that defendants proposed to use the roadway in question (whether in its then present state or as expanded to 40 or even 80 feet) when and if a public right of way was acquired by the developers themselves, or by condemnation proceedings initiated by appropriate city or county authorities. Such is the limited import of the master streets and highway plan. The evidence presented in this case permits the finding inherent in the express finding of the jury that defendants were asserting a then present right to use plaintiffs' property for access to their own property, and that the representation inherent in this claim was false.

Furthermore it may be noted in connection with the award of exemplary damages that Mr. Glass testified that he protested to defendants' representative when he first saw the model, and that he was assured it was a mistake and would be corrected. Nevertheless no corrections were made in the model or the maps and this lawsuit resulted. On the contrary when the state park representatives indicated that access over state park lands would not be permitted, the master plan booklet and other representations to the contrary were revised.

### Disparagement

The jury were instructed, "A statement is disparaging if it throws any doubt upon the ownership of the property, not only by complete denial of the title, but by claim of some interest in it."

Section 629 of the Restatement defines "disparagement" as follows: "Matter which is intended by its publisher to be understood or which is reasonably understood to cast doubt upon the existence or extent of another's property in land, chattels or intangible things, or upon their quality, is disparaging thereto, if the matter is so understood by its recipient."[4] (See also *Gudger* v. *Manton, supra,* 21 Cal.2d 537, 542-543; and *Phillips* v. *Glazer, supra,* 94 Cal.App.2d 673, 677.)

App.2d 614, 622-625; and *Davis* v. *Wood, supra,* 61 Cal.App.2d 788, 794-795.) The jury, by returning exemplary damages in the sum of $6,500 under proper instructions necessarily found that the defendants were guilty of oppression or malice, express or implied. (See Civ. Code, § 3294.)

[4]The Restatement gives the following significant illustration of disparagement: "5. A tells B, whom he knows to be contemplating the purchase of a home in a particular suburb, that C's parcel of land, which is attractive for that purpose, is subject to a

The thrust of defendants' argument is aimed at the fact that plaintiffs did not establish that any particular prospective purchaser or lessee was deterred from negotiating or contracting with plaintiffs because he was the "recipient" of the false information disseminated by the defendants. ▇ It is recognized, however, that the property owner may recover for the impairment of the vendibility "of his property" without showing that the loss was caused by prevention of a particular sale. "The most usual manner in which a third person's reliance upon disparaging matter causes pecuniary loss is by preventing a sale to a particular purchaser. . . . The disparaging matter may, if widely disseminated, cause pecuniary loss by depriving its possessor of a market in which, but for the disparagement, his land or other thing might with reasonable certainty have found a purchaser." (3 Rest., Torts (1938) § 633, coms., a & f, pp. 348 and 349.)

In *Gudger* v. *Manton, supra,* the damages were predicated upon loss of sales of the property by reason of the disparaging levy of a writ of execution without the exercise of good faith. (21 Cal.2d at p. 554.) In *Davis* v. *Wood, supra,* the court reviewed the earlier case and stated, "However, there is nothing in the case of *Gudger* v. *Manton* which requires a complaint to show that any pending deal or sale was interfered with, but it was held in that case that evidence that a pending sale was interfered with sustained a finding of damages." (61 Cal.App.2d at p. 796.) After reviewing the provisions of section 624 (*supra*) and of section 633[5] of the Restatement of Torts and the comments following section 633, which have been referred to above, the court concluded, "From the foregoing statements of the law relating to damages for slander to title, or, to state it more accurately, for wrongful disparagement of title, it is apparent that the elements of damages are the loss caused by the impairment of vendibility and the cost of clearing the title." (*Id.* at p. 798.) Although the latter case involved a question of pleading, it clearly indicates that the disparagement and ensuing damage may be established by other than showing a loss of a particular potential sale.

right of way granted to the owner of a neighboring quarry which entitles the latter to haul stone from the quarry to the highway across a part of C's land. A has disparaged C's property in the land." (3 Rest., Torts (1938) pp. 340-341.)

[5]Section 633 of the Restatement of Torts reads: "The pecuniary loss for which a publisher of disparaging matter is liable under the rules stated in §§ 624 and 626-627 is restricted to (a) that pecuniary loss which directly and immediately results from the impairment of the vendibility of the thing in question caused by publication of the disparaging matter, and (b) the expense of litigation reasonably necessary to remove the doubt cast by the disparagement upon the other's property in the thing or upon the quality thereof." (Rest., Torts, § 633, pp. 347-348.)

## Title

Defendants contend that the plaintiffs failed to show that they had title to their property free of the public easement which the defendants allegedly claimed. The evidence showed that the property lines in the recorded deeds to the plaintiffs embraced the portion of the roadway in question, and that neither the defendants nor the public had any recorded interest in the right of way over that land. The court found that plaintiffs owned the property which they claimed; that the evidence did not support a finding of obvious long-continued use of the road over the Glass property giving rise to an implied easement; and that the implied easement contended for by defendants under their recorded title was not reasonably necessary to the enjoyment of their land. It properly instructed the jury, as quoted above, that there was no record of any conveyance of a right of way to the public or to the defendants.

Defendants' attacks on these findings and instructions are discussed below.

## Damages

The jury's answers to special interrogatories indicate that it found that the false and unprivileged statements and representations made by the defendants respecting plaintiffs' property resulted in pecuniary loss to plaintiffs in the sum of $5,000 and warranted additional exemplary damages in the sum of $6,500. The elements of the pecuniary loss requisite to sustain an action for disparagement of title are set forth in section 633 of the Restatement of Torts (see fn. 5 above). Defendants' contentions concerning the necessity of proof of loss of particular sales have been reviewed and answered in connection with the subject of disparagement.

Mr. Glass testified that the present improved roadway over his property which was between 15 and 18 feet wide occupied about 11,000 square feet; that if it were improved to a width of 40 feet it would occupy 31,000 square feet, and double that sum if 80 feet wide. He stated that if the road were widened to 40 feet he would lose three building sites of a value of $75,000. He also testified to further damages in the event he lost his house and the site it was on, bringing the aggregate to $194,000.

Plaintiffs' expert witness testified that he valued the property at $291,700 as of June 1965 when the defendants commenced their proceedings before the planning commission; and that at the time of trial, he valued it at $194,500 or $195,000. In his opinion its value had depreciated about $97,000 because of the threat of the 40- and 80-foot roads.

Defendants point out many facts and circumstances impeaching the

testimony of plaintiffs' expert and the testimony of the co-owner. They also refer to the less equivocal testimony to the contrary of their own two experts. The question of the credibility of the witnesses and the weight to be given their testimony was for the jury. ██ It cannot be said as a matter of law that plaintiffs failed to show that there was an impairment of the vendibility of the property resulting in pecuniary loss.

The fact that this loss was removed by the planning commission's ultimate denial of access over the threatened route upon the protests of plaintiffs, and by the successful termination of the issues framed by defendants' cross-complaint does not dispose of the fact that the plaintiffs' title to their property was affected by the alleged disparagement during all of the intervening period. (See *Gudger* v. *Manton, supra,* 21 Cal.2d 537, 554.)

Furthermore it should be noted that the court instructed the jury that the plaintiffs' pecuniary loss could be measured by the cost of recovering or restoring the property value which existed prior to the disparagement.[6] (See discussion of attorneys' fees, VIII, below.)

Defendants' attacks on the sufficiency of the evidence to sustain the judgment insofar as it is predicated on the jury's verdict, and the jury's answers to the specific interrogatories cannot be sustained.

## II.

██ At the request of the defendants, through their objections to plaintiffs' proposed findings, and their proposed counterfindings and corrections,

---

[6]No instruction was given with respect to the pecuniary loss as set forth in subdivision (b) of section 633 of the Restatement (see fn. 5, above); nor has the court's attention been directed to any evidence on that subject. The record reveals that plaintiffs and defendants each offered an instruction based on the provisions of section 633 (see *Wright* v. *Rogers* (1959) 172 Cal.App.2d 349, 366 [342 P.2d 447] and *Davis* v. *Wood, supra,* 61 Cal.App.2d 788, 797); and that all references to the expenses of litigation were withdrawn, and the balance of each instruction was indicated as "modified." The instruction given reads as follows: "If, based upon the instructions just given you, you conclude that the defendants have committed a slander of title, you should then determine whether they have been damaged. I instruct you that the measure of damage is the amount which will compensate for all the detriment proximately caused by defendants' slander of title, whether such damages could have been anticipated or not. In other words, the money loss for which defendants would be liable to plaintiffs is that which directly and immediately resulted from the impairment of the vendibility of plaintiffs' land caused by publication of the disparaging matter. The plaintiffs' pecuniary loss may be measured by the decrease in the value of their property, if any, or by the difference between the price that would have been paid before disparagement of title and the lower price obtainable after the disparagement, if you find such existed, or by the cost of recovering or restoring the property value which existed prior to the disparagement. In any event, should you find that plaintiffs are entitled to damages, they should be restored to the position they would have occupied had the wrongful act of the defendants not occurred."

the court found that prior to June 21, 1945 the whole of the property which embraced the whole of the westerly extension of Spencer Avenue (sometimes referred to by that name, and sometimes referred to as Wolfback Ridge Road) was in one ownership; that on that date the owners conveyed the northerly portion of the property, which embraces the portion of the roadway in question here, to plaintiffs' predecessor in interest; that said conveyance referred to a Spencer Avenue easement; and that subsequent conveyances make reference to road easements over Spencer Avenue.

The evidence shows that the 1945 deed in question from Wright and others to Corbett and another recites, "Subject to Spencer Avenue easement." There was no mention of any property to which the easement was to be appurtenant, but the grantors at that time retained the southerly half of the property which was served by the upper reaches of the roadway.

Thereafter on February 26, 1946, the original owners entered into an agreement with defendants' predecessor in title to particularly describe the course of the upper reaches of the road which they used jointly. The effect of this agreement is discussed below (IV).

In 1947 the Glasses acquired from the Corbetts a portion of their holdings at the time of suit and built their residence on that parcel in the following year.

On February 21, 1949, the Corbetts caused to be prepared and filed a "licensed survey, Wolfback Ridge Sausalito, Calif.," which purported to show a 40-foot right of way for Spencer Avenue across the property. On July 21, 1950, the Corbetts conveyed the bulk of their property to Lynch by deed which recited "Subject to road easement over the included portions of Spencer Avenue and Ridge Road, as shown on said map [referring to the licensed survey]." On June 28, 1956, a deed was recorded from the Lynchs to the Glasses with similar recitals.

Defendants' first attack on plaintiffs' title assumes from the foregoing that the plaintiffs did not have an unrestricted right to close off Spencer Avenue as their private property, but in fact hold their property subject to an easement of many years' standing, usable by a substantial number of uphill owners, including defendants, if not the public generally. It is true that the qualifications on plaintiffs' title do not indicate the dominant estate which is to enjoy the reserved easement. The record, however, indicates that the easement was reserved for the benefit of the property owned by Wright et al. at the time they conveyed a portion to the Corbetts. Except as hereinafter noted (IV) there is no indication that the defendants or the public generally were privy to any grant or reservation of an easement. The plaintiffs were entitled to assert their record title in fee against all

except those owning the particular property for which the easement had been reserved.

The situation is governed by the rules collected in *City of Los Angeles* v. *Howard* (1966) 244 Cal.App.2d 538 [53 Cal.Rptr. 274], reading as follows: " 'The extent of a servitude is determined by the terms of the grant, or the nature of the enjoyment by which it was acquired' (Civ. Code, § 806), and the extent of an easement is a question of interpretation (2 Witkin, Summary of Cal. Law (7th ed. 1960) Real Property, § 177, p. 1017). 'Where an easement is founded upon a grant, as here, only those interests expressed in the grant and those necessarily incident thereto pass from the owner of the fee.' (*Pasadena* v. *California-Michigan etc. Co.* (1941) 17 Cal.2d 576, 579 . . . .)

"These same rules apply where an easement is created by a reservation thereof in the original conveyance—the theory being stated that 'there is deemed a "grant back" from the grantee of some new interest. . . .' (Burbe, *Land Burdens in California—Easements* (1930) 4 So.Cal.L.Rev. 115, 122; *Coon* v. *Sonoma Magnesite Co.* (1920) 182 Cal. 597. . . .)" (244 Cal.App. 2d at pp. 542-543, fn. omitted.)

A map maker for the county assessor testified that the portion of Wolfback Ridge Road delineated on the assessor's maps of the Glass property had not been assessed since 1958. This testimony was predicated upon the fact that the road as so designated did not have a parcel number. The witness could not tell whether the value was included in the appraisals of the adjacent properties. Mr. Glass testified, and produced tax bills which showed that his original holding was assessed prior to the adoption of the parcel system by a metes and bounds description which was to the center of the roadway subsequently depicted on the assessor's parcel maps. The action of the assessor in mapping the property could not alone create rights in the public or in the defendants.

## III.

The court charged the jury, "The first question you are asked to determine in this case is whether the plaintiffs have dedicated their portion of Wolf Back Ridge Road for public use. There are two methods by which private property may become a public way other than by purchase. They are: one, by an offer of dedication by the owner and a formal acceptance by a public authority or long-continued use by the public itself; two, where no express offer of dedication is made by the owner, by long-continued adverse use by the public. In such event, offer of dedication by the owner is presumed." The detailed instructions on the subject occupy two pages of the reporter's transcript. They are not attacked by defendants, nor is complaint

made that the court omitted to give any instructions requested by them. From all that appears the jury was fully and fairly instructed with respect to the principles which the defendants now rely on as demonstrating that the evidence shows an intention to dedicate for public use and establishes an acceptance thereof, implied by law from long-continued public use.[7]

The jury, by its answer to the first of the specific interrogatories, and by its selection of the form of verdict, specifically found that there had been no dedication for public use. The court expressly found, "The evidence does not support a finding of obvious, long continued use of the road over the Glass property giving rise to an implied easement."

Defendants point to the following evidence as necessitating a contrary finding: (1) Testimony of the 73-year-old former street superintendent of the City of Sausalito relating his use of the road for hunting when he was a youth, and detailing work done on the road while he was a city official; (2) testimony of plaintiffs' predecessor in title concerning his use of the road and its open nature both before and after his conveyance to plaintiffs in 1957; (3) testimony of the former city fire chief concerning the open nature of the road during the 23-year-period preceding his retirement in 1964; (4) testimony of a tenant of defendants' predecessor in title that he used the road to get to the grazing lands he leased; (5) testimony of defendants' civil engineer concerning the condition of the road and his use of it prior to the Marincello proposals; and (6) testimony of a Sausalito resident relating back to 1928 or 1929 concerning his use of the road while hunting. From this testimony, if believed (and it is not contradicted), it can be assumed that until 1966, after the instigation of this suit, when a barricade was put across the western reaches of the road (see VI, below), the road had not been obstructed; that for most of the time there had been no signs indicating that it was a private road; and that city equipment had been used to improve the road.

On the other hand it appears that the grading work may have been done to improve the surface of the road for use as a fire road and to prevent flood damage below; that the residents of the area itself through a property owners' association improved the road in 1962, 1963, and 1965; that the width and extent of the trail or road which was used to traverse the property in the

[7]See *Union Transp. Co.* v. *Sacramento County* (1954) 42 Cal.2d 235, 240-241 and 243-244 [267 P.2d 10]; *County of Inyo* v. *Given* (1920) 183 Cal. 415, 418 [191 P. 688]; *Smith* v. *San Luis Opisbo* (1892) 95 Cal. 463, 466-467 and 470-471 [30 P. 591]; *Brick* v. *Keim* (1962) 208 Cal.App.2d 499, 501-504 [25 Cal.Rptr. 321]; *People* v. *Sayig* (1951) 101 Cal.App.2d 890, 896-897 [226 P.2d 702]; *Ball* v. *Stephens* (1945) 68 Cal.App.2d 843, 846-847 [158 P.2d 207]; *Richardson* v. *O'Hanrahan* (1927) 83 Cal.App. 415, 421 [256 P. 1103]; 39 C. J. S., Highways, § 5, pp. 923-924; and 2 Witkin, Summary of Cal. Law (1960) Real Property, §§ 28-29, pp. 884-885.

past is in dispute; that signs had been posted from time to time; that police had been called to remove trespassers and Glass had himself deputized to facilitate such action; that the road was not improved as a city street and was only of utility in serving the home abutting on it; that it was privately landscaped; that the roadway was taxed to Glass prior to the adoption of the parcel system of assessment; and that the electric and gas utility and the state Highway Department had recognized the private nature of the roadway in acquiring rights from the owners.

At best it might be assumed that the incidental use established by defendants' witnesses if taken alone would be sufficient to establish a public use arising out of an implied dedication and acceptance. It is clear, however, that the evidence produced by plaintiffs is sufficient to meet defendants' showing, and supports the findings of the jury and the court in favor of the plaintiffs.

### IV.

It appears from the record that on February 26, 1946 (after title to the northerly portion of the property which embraces the portion of the roadway in dispute in this action had been conveyed) the owner of the remaining southerly portion of the Wolfback Ridge property entered into an agreement with defendants' predecessor in title concerning the uphill reaches of the roadway which ran downhill through the property theretofore conveyed, to Spencer Avenue in Sausalito. The agreement recites: "THAT WHEREAS, the parties to this agreement are the owners of certain lands on the ridge between Rodeo Valley on the one side and the City of Sausalito on the other side and there is no present right of way for ingress and egress to and from the portions of said property lying on either side and on top of said ridge, and the parties hereto wish to provide a private right of way for the purpose of reaching the lands of each of them and of those persons to whom the Parties of the Second Part have heretofore conveyed certain portions of said real property,

"Now, THEREFORE, and for the purpose of laying out and defining a certain private right of way, the parties to this Agreement and Grant, do by these presents agree as follows, and each grants to the other the right to the use of the hereinafter described parcels of land as a private right of way appertaining to the lands which abut thereon belonging to the parties hereto and to their grantees, past, present and future, and each of the parties hereto does hereby grant to the other the right to use as a right of way that certain tract of land, being a strip of land 40 feet wide at the head of Spencer Avenue, in Sausalito Township, County of Marin, State of California, the center line of which is described as follows, to-wit: . . ."

There follows a description which includes a roadway running from east to west, in part across the southerly portion of the lands held by Wright et al., and in part over adjoining lands, presumably those of defendants' predecessor in title. On the west the described roadway was and is intersected by "Alta Avenue" which runs thence westerly into defendants' lands. The described easement then runs northerly approximately 130 feet to the point of the beginning of the description. A description of a second parcel, which apparently adjusts the property line of the first description, refers to it as "a small tract of land at the end of Alta Avenue and lying between Alta Avenue and Spencer Avenue. . . ."

The defendants contend that the foregoing instrument created, for the lands held by plaintiffs' predecessor in title, an implied easement in that portion of Spencer Avenue, (Wolfback Ridge Road), which lies below the easement particularly described in the 1946 agreement, and which traverses the property owned by plaintiffs and their predecessors in interest. The trial court, however, after making express findings concerning the conveyances upon which defendants now rely, specifically found, "The implied easement contended for by defendants and cross-complainants is not reasonably necessary to the enjoyment of their land." It concluded, as it had instructed the jury, "Cross-complainants [defendants] are not the holders of any easement of record or implied easement over the land held by cross-defendants Warren and Ida Lou Glass." Defendants must show that these findings are erroneous as a matter of law.

Defendants state that it is not unreasonable to assume that the parties to the 1946 agreement—the owners of the southerly upland portion of the Wolfback Ridge property and defendants' predecessors in title—felt that each of them had a clear right to travel over the northerly lower property, from the state highway to the point at which the described easement commenced.

The recitals quoted above demonstrate that Wright et al., intended to give defendants a right of ingress and egress between Rodeo Valley and the City of Sausalito and that it was contemplated that the right of way would extend to the property of others theretofore conveyed by Wright et al. (presumably the property below conveyed to the Corbetts). The reference to "grantees, past, present, and future" in the habendum clause conveys the same intent. Furthermore the reference to "the head of Spencer Avenue," and the realignment between "Alta Avenue" and "Spencer Avenue" indicates that the parties were realigning and making certain the description of but a portion of what was an existing roadway. It is difficult to explain the purpose in setting forth and realigning the description of the northerly projection of the described roadway from Alta Avenue unless it was to connect with an exist-

ing roadway to Sausalito. (See *Bartholomae Corp.* v. *W. B. Scott Inv. Co.* (1953) 119 Cal.App.2d 41, 45-46 [259 P.2d 28].)

On the other hand the defendants have failed to show that they or their predecessors in title ever acquired a right of way over the lower reaches of Spencer Avenue by grant or prescription. It is clear that Wright et al., having divested themselves of title could not in 1946 create rights in the lands which they already had conveyed to Corbett. As noted above (II) the reservation in the Corbetts' deed, and the reservations and references in the deeds to the Corbetts' successors in title were properly construed by the trial court as applicable to Wright et al. and the successors in interest of the property owned by them at the time of their conveyance to the Corbetts.

For the same reason, the 1946 agreement could not create an implied easement over the Corbett property for the benefit of the lands held by defendants' predecessor in title. ■ When the owner of two parcels sells one of them, or the owner of an entire estate sells a portion, the purchaser takes the parcel or portion sold with all the benefits and burdens which appear, at the time of sale, to belong to it, as between it and the property which the seller retains. (See *Bartholomae Corp.* v. *W. B. Scott Inv. Co.,* *supra,* 119 Cal.App.2d 41, 44; *Orr* v. *Kirk* (1950) 100 Cal.App.2d 678, 681 [224 P.2d 71]; *Rosebrook* v. *Utz* (1941) 45 Cal.App.2d 726, 728-730 [114 P.2d 715]; 17 Cal.Jur.2d, Rev., Easements, §§ 15-19, pp. 142-152; and 2 Witkin, Summary of Cal. Law (1960) Real Property, §§ 183-188, pp. 1022-1027.) This principle would sustain a finding that the Corbetts, as purchasers, took their property burdened by an easement in favor of the lands of Wright et al., as sellers, even if there had not been an express reservation. It is, however, no predicate for the creation of an additional burden on the lands of the Corbetts, by a subsequent conveyance from Wright et al., to defendants' predecessor. The 1946 agreement could only expressly or impliedly burden the lands held by Wright et al. at the time it was executed.

Furthermore it should be noted that the habendum clause refers to "a private right of way appertaining to the lands which abut on [the parcels particularly described]." It is arguable that this would limit the use of the described roadway and an extension thereof to the owners of homesites or parcels abutting on that described roadway. In any event it is a far cry from a public roadway, whether 40 or 80 feet wide, designed to serve a community of 20,000 to 30,000 persons, with a daily flow of from 473 to 600 outgoing vehicles, or even 40 percent of that volume of traffic.

Insofar as defendants' argument on this point suggests that the Corbetts and their successors took their property burdened with an implied easement in favor of the lands owned by defendants' predecessor it must stand or fall with the question of prescriptive rights considered above (III). The occa-

sional use by a tenant of that owner did not establish the right claimed by defendants.

Finally Alta Avenue presumably connected or could connect with access from Tennessee Valley or Rodeo Avenue. Therefore, it would not necessarily follow that Wright et al. were creating an easement by necessity (assuming their power to do so over the Corbett property), because the easement rights they conveyed to defendants' predecessor could only be used over the entire Spencer Avenue roadway. (See *Orr* v. *Kirk, supra,* 100 Cal. App.2d 678, 684-685.) At best the application of the principle of necessity would only apply to users owning property abutting on the roadway described in the agreement, and it could not be stretched to serve all served by Alta Avenue and other streets and roadways yet to be developed.

## V.

Defendants claim that the evidence demonstrates, despite Mr. Glass' testimony to the contrary, that no steps were taken to close the road or post it as a private road until the time the lawsuit was commenced; that the testimony of their witnesses compels a finding that the road was never so posted; that the assessor's maps since 1958 failed to show the roadway as assessed to any property owner; that defendants' agents and employees freely used the road in the planning stages of the project; that Corbetts' licensed survey did not designate the road shown thereon as a private road; and that the county's master plan showed a road over the property as a feeder road. They contend that since the record shows that they expended time and effort in the development of the project on the assumption that the foregoing facts evidenced that the roadway over the Glass property was ·a public road, the plaintiffs are barred by laches from thereafter asserting their right to insist that the road is a private easement for those in the Wolfback Ridge area whose property abuts on it. (See *Abbott* v. *City of Los Angeles* (1958) 50 Cal.2d 438, 458-459 [326 P.2d 484]; *Livermore* v. *Beal* (1937) 18 Cal.App. 2d 535, 546-549 [64 P.2d 987]; 18 Cal.Jur.2d, Rev., Equity, §§ 44, 45 and 51-52, 184-186 and 196-200.)

"Whether laches occurred in a particular case presents a question primarily for the trial court, and an appellate court will not interfere with a trial court's discretion in this respect unless it is obvious that manifest injustice has been done, or unless its conclusions do not find reasonably adequate support in the evidence." (18 Cal.Jur.2d, Rev., *op. cit.,* § 62, pp. 216-217.) The trial court expressly found, "Plaintiffs and cross-defendants acted promptly to protect their legal interest in Wolfback Ridge Road." It concluded "Plaintiffs and cross-defendants are not guilty of laches."

The record shows that Mr. Glass protested when he learned of defend-

ants' plans and representations through the model, and that he filed suit as soon as he learned that the defendants were proceeding inconsistently with their former statements that it was all a mistake. There was no duty on plaintiffs to correct the pre-existing facts on which defendants purport to have relied unless those facts rose to the dignity of creating a public easement by prescription. That issue has been resolved adversely to defendants. (III, above.)

## VI.

The trial court found that the defendants are the holders of an easement of record for right of way purposes over property which has been referred to above (IV) as a northerly projection of the easement described in the 1946 agreement and entitled to access and egress from that easement to Alta Avenue. The judgment provided that Erway, the owner of the land subject to that portion of the easement described in the 1946 agreement, and the Glasses, "shall be and they are permanently enjoined and restrained hereafter from physically obstructing defendants and cross-complainants from gaining access between Alta Avenue and the upper portion of Wolfback Ridge Road. . . ."

This judgment resulted from the establishment of defendants' claim, asserted in their cross-complaint, that their access had been blocked by physical barriers erected by Erway and the Glasses after the suit was filed. Defendants contend that plaintiffs' participation in this illegal act deprived them of the right to seek relief in the court under the maxim that he who comes into equity must do so with clean hands. (See Lynn v. Duckel (1956) 46 Cal.2d 845, 850 [299 P.2d 236]; and 18 Cal.Jur.2d, Rev., op. cit., § 31, pp. 165-167.)

Defendants raised this issue in their answer to the complaint. Plaintiffs' demurrer to that portion of the answer was "sustained as to the defense of unclean hands, the defendants to have 15 days leave to amend." No amendment was filed. The pretrial order recites, "this issue is no longer in the case." In any event it is questionable whether plaintiffs' misguided attempts at self-help would defeat the right to recover damages for slander of title which had already accrued.

## VII.

The jury's answers to special interrogations indicate that of the total sum of $11,500 damages awarded by the jury, $6,500 represented exemplary damages. In their motion for new trial the defendants asserted

among other grounds irregularity in the proceedings of the jury and misconduct of the jury.[8]

Defendants submitted the declarations of three jurors. With respect to the determination of the amount of punitive damages, one stated, ". . . we agreed that the average should be taken, and each juror around the table then gave his figure, the sum of the figures was divided by twelve, and the average was used as the figure for punitive damages. [¶] The average was $6,300.00 and this was simply rounded off to $6,500.00."

A second related, ". . . it was decided that we would use an average figure. Consequently, each juror around the table gave his figure as to what he felt was a proper figure for punitive damages. These figures were added up, and divided by twelve. It had been agreed that this average would be the amount of punitive damages. The average came to $6,300.00, and was rounded off to the nearest $500.00—that is, $6,500.00. This was the figure that was returned as punitive damages."

A third declared, "The jury was unable to agree on the amount, and it was suggested that if we could agree on an average, this might resolve the problem. Consequently, it was agreed that each juror around the table would, in turn, give his figure, that the number so given would be totaled and divided by twelve, thus arriving at an average, and that the average would be used as the amount of punitive damages to be given plaintiffs. This was, in fact, done, and the average proved to be $6,300. The figure was then rounded off to $6,500, and that amount returned as the verdict on punitive damages." This last juror even produced the piece of paper on which the foreman had computed the average.

Both sides agree that the matter is governed by the following rules: "When jurors agree to vote for a verdict in an amount to be calculated by an averaging of the sums being voted by some or all of them, it constitutes one arrived at by chance which should be set aside. [Citations.] But it is not improper for jurors to calculate an average amount as a basis for discussion if there is a later consideration of the amount and a vote upon it, even if they agree upon that amount. [Citations.]" (*Will* v. *Southern Pac. Co.* (1941) 18 Cal.2d 468, 477-478 [116 P.2d 44]. See also *Monroe* v. *Lashus* (1959) 170 Cal.App.2d 1, 5-7 [338 P.2d 13]; *Buhl* v. *Wood Truck Lines* (1944) 62 Cal.App.2d 542, 544-546 [144 P.2d

---

[8]Subdivision 2 of section 657 of the Code of Civil Procedure reads as follows: "Misconduct of the jury; and whenever any one or more of the jurors have been induced to assent to any general or special verdict. or to a finding on any question submitted to them by the court. by a resort to the determination of chance, such misconduct may be proved by the affidavit of any one of the jurors."

847]; and Leavitt, *The Jury at Work* (1962) 13 Hastings L.J., 415, 441-443.)

▮ Since the sum agreed upon was not the average, it may be inferred that there was in fact an agreement after the averaging, and that therefore the verdict—in this case, the answer to the special interrogatory—cannot be impeached. (See *Will* v. *Southern Pac. Co., supra,* 18 Cal.2d at p. 477; and *Monroe* v. *Lashus, supra,* 170 Cal.App.2d at p. 6.)

Furthermore it affirmatively appears that the jurors had an opportunity to and apparently did reconsider their verdict. When the general verdict of $11,500 was first announced, a poll of the jurors indicated only eight affirmative votes. The court instructed the jury that it was necessary that nine jurors agree to the answer to each special interrogatory and to the form of verdict returned. He returned them to the jury room to reconsider the matter. On their return a poll of the jury indicated nine affirmative and three negative answers. On this record the trial court was warranted in finding that the figure selected was approved by the requisite number of jurors after the average was ascertained.

The foregoing makes it unnecessary to consider another theory, suggested by the trial court among its reasons for denying the motion for new trial, that the policy against agreeing to an average should not be applicable with respect to punitive damages.

## VIII.

▮ Among the issues set forth in the pretrial order was the extent to which the plaintiffs were damaged, assuming the jury found that plaintiffs were entitled to damages for slander of title. The order states: "All of the foregoing issues (including damages) would be by jury." In the post-verdict proceedings relating to attorney's fees, the plaintiffs contended that they had sought an amendment to the pretrial order to set forth this issue, and that the judge who conducted the pretrial hearing determined that such amendment was unnecessary. The trial court found that such was the case.[9]

Nevertheless there is nothing in the record prior to verdict to indicate that the issue of attorney's fees was raised. (Cf. fns. 5 and 6, above.) The min-

---

[9]The trial court's opinion on the issue of attorney's fees states: "Although the pretrial order is silent on the subject of attorney's fees, a letter from the pre-trial judge dated September 19, 1966, states: 'I feel that no modification of the pre-trial order is necessary. On page 6, line 8, one of the issues is stated as follows: "Were plaintiffs damaged thereby and to what extent?" I feel this issue as stated is sufficiently broad to include attorney's fees if plaintiffs are in fact entitled thereto. . . . This would be for the trial judge to determine and I believe the pre-trial order as stated would afford the trial judge scope to do so.'" (Cf. *Prentice* v. *North Amer. Title Guar. Corp.* (1963) 59 Cal.2d 618, 621-622 [30 Cal.Rptr. 821, 381 P.2d 645].)

utes reflect that on May 15, 1967, 10 days after the verdict, "This matter came on for further hearing on legal matters, counsel meeting with the court in chambers, court attaches excused." Apparently at this time or at some prior time the plaintiffs made a motion for attorney's fees, because the minutes continue, "The court ordered the matter placed on calendar . . . for hearing on . . . motion for attorney's fees. . . ."

On May 22, 1967, in connection with their motion for new trial defendants filed points and authorities which included a section in opposition to plaintiffs' motion for attorney's fees. At that time the defendants contended that "it must be presumed that plaintiffs' cost of litigation, including attorney's fees, were taken into account in fixing damages." (See Rest., Torts, § 633, and fns. 5 and 6 above.)[10] An indorsement on this memorandum in what appears the handwriting of the judge states, "Expressly reserved by agreement of counsel no jury instr. on subject." Since the contention originally advanced by defendants, which in the absence of such a stipulation was undoubtedly correct (see fns. 5 and 6 above, accompanying text), was not subsequently advanced, it appears that the question of damages by way of attorney's fees had been in fact reserved from consideration by the jury. This conclusion is also necessitated by the judge's uncontradicted comments to the same effect when the question of attorney fees was argued before the court.

This issue then resolves itself into whether the expense of litigation reasonably necessary to remove the doubt cast by the disparagement upon the plaintiffs' interest in the land in question is recoverable. As has been set forth above, it is. (Rest., Torts, § 633, fn. 5 above.)

Defendants rely on section 1021 of the Code of Civil Procedure which provides: "Except as attorney's fees are specifically provided for by statute, the measure and mode of compensation of attorneys and counselors at law is left to the agreement, express or implied, of the parties; but parties to actions or proceedings are entitled to costs and disbursements, as hereinafter provided." (See *Prentice* v. *North Amer. Title Guar. Corp., supra,* 59 Cal.2d 618, 620; *Reid* v. *Valley Restaurants, Inc.* (1957) 48 Cal.2d 606, 610 [311 P.2d 473]; and *Lee C. Hess Co.* v. *City of Susanville* (1959) 176 Cal.App.2d 594, 599-600 [1 Cal.Rptr. 586].) A recognized exception is stated as follows: "A person who through the

[10]The defendants further relied on an affidavit of a juror who stated, "It was my understanding that the general damages which we awarded were to compensate the plaintiffs for the costs of their suit." Although the rigidity of the rule that a juror cannot impeach the verdict of the jury has been greatly ameliorated, it still applies to preclude resort to evidence concerning the mental processes by which the verdict was determined. (Evid. Code, § 1150; see *People* v. *Hutchinson* (1969) 71 Cal.2d 342, 346-351 [78 Cal.Rptr. 196, 455 P.2d 132].)

tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person is entitled to recover compensation for the reasonably necessary loss of time, attorney's fees, and other expenditures thereby suffered or incurred. [Citations.]" (59 Cal.2d at p. 620.) (*Prentice* v. *North Amer. Title Guar. Corp.,* *supra,* 59 Cal.2d 618, 620. See also *Ruth* v. *Lytton Sav. & Loan Assn.* (1968) 266 Cal.App.2d 831, 844-845 [72 Cal.Rptr. 521]; *Spencer* v. *Harmon Enterprises, Inc., supra,* 234 Cal.App.2d 614, 621; and *Contra Costa County Title Co.* v. *Waloff* (1960) 184 Cal.App.2d 59, 67-68 [7 Cal.Rptr. 358].) ▮ The last two cases cited involve slander of title and make it clear that the expense of clearing title is a proper element of damages in such an action. Here the plaintiffs and cross-defendants claimed attorney's fees aggregating $4,232.80 in successfully resisting defendants' cross-complaint.[11] The court made findings in favor of plaintiffs[12] and concluded, "Plaintiffs and cross-defendants are entitled to the sum of $4,232.80 as attorney's fees for that portion of the litigation conducted to remove the cloud on their title to Wolfback Ridge Road and defending the quiet title action instituted by defendants in their cross-

---

[11] Plaintiffs originally applied for $1,000 attorney's fees on behalf of cross-defendant Erway and $3,232.80 on behalf of plaintiffs and cross-defendants Glass to compensate those parties for the attorney's fees incurred in resisting defendants' claim of title. Code of Civil Procedure section 1021 precludes the recovery of such fees by either party to an ordinary suit to quiet title. The fees, therefore, must represent an element of damages reserved for court decision in the slander of title action. Since Erway was not a party to that phase of the action there is no basis for awarding him attorney's fees as damages. There is no mention of attorney's fees for Erway in the court's "Findings of Fact With Respect To Attorney's Fees." The conclusions of law make the award only to "plaintiffs and cross defendants"; and the judgment specifically awards the $4.232.80 to the Glasses. On the record it does not appear that any sum was erroneously awarded Erway.

[12] The findings recite:

"FINDINGS OF FACT WITH RESPECT TO ATTORNEY'S FEES

"1. By their verdict a jury has found that defendants and cross-complainants have slandered plaintiffs' title to certain real property.

"2. Plaintiffs and cross-defendants Warren and Ida Lou Glass have become involved in litigation as a result of the tortious conduct of defendants and cross-complainants.

"3. Said litigation is not an ordinary two-party lawsuit.

"4. Said lawsuit involved exceptional circumstances.

"5. Plaintiffs and cross-defendants have been placed in such relationship with others as to make it necesary to incur legal expense to protect their interests.

"6. A portion of said lawsuit has been devoted to defending the quiet title action instituted by defendants and cross-complainants and to establishing the nature and extent of plaintiffs' and cross-defendants' legal interest in Wolfback Ridge Road.

"7. Such other findings of fact as are set forth in the Court's memorandum of opinion filed July 21, 1967, are incorporated herein by reference."

complaint." The court was competent to determine the amount of fees to be awarded. (*Spencer* v. *Harmon Enterprises, Inc., supra,* 234 Cal.App. 2d 614, 621.)

In the absence of a cross-appeal by the plaintiffs it is unnecessary to determine whether they were entitled to all of the attorney's fees incurred, allegedly of a value of $20,000 to $30,000.

It may be (see fns. 5, 6 and 10, above) that there is some element of double recovery in the general damages awarded and the attorney's fees. If each party agreed to reserve that question, neither can presently object to the procedure followed by the court, or the failure of the court to fully modify the instructions given. Any error was invited.

## IX.

Plaintiffs included in their cost bill an item of $156.75 for depositions, and an item of $383.62 for a transcript of the proceedings held in connection with the granting of a preliminary injunction. It was alleged, and not controverted, that although the transcript was not ordered by the court, the parties agreed that it should be prepared to relieve counsel of the necessity for taking depositions, and that the cost would be shared. Defendants moved to strike the foregoing items from the cost bill on the grounds that the depositions were unnecessary (see Code Civ. Proc., § 1032a; *Lomita Land & Water Co.* v. *Robinson* (1908) 154 Cal. 36, 52 [97 P. 10]; and *Fellowship of Humanity* v. *County of Alameda* (1957) 153 Cal. App.2d 673, 701-703 [315 P.2d 394]); and that the costs of a transcript may only be taxed as costs when the transcript is ordered by the court (see Gov. Code, § 69953; *Sunny Slope Water Co.* v. *City of Pasadena* (1934) 1 Cal.2d 87, 99-100 [33 P.2d 672]; *Barkly* v. *Copeland* (1890) 86 Cal. 493, 494 [25 P. 3]; *Corona Foothill Lemon Co.* v. *Lillibridge* (1936) 12 Cal.App.2d 549, 553-555 [55 P.2d 1210]; and *People's Ditch Co.* v. *Foothill Irr. Dist.* (1932) 123 Cal.App. 257, 260 [11 P.2d 86].)

From the record it appears that the depositions of four witnesses were involved. Defendants contend that the depositions were unnecessary because the information contained in the depositions had been adduced through the evidence presented at the hearing on the preliminary injunction, which evidence included the declarations of two of the witnesses in question. Defendants acknowledge that the matter is one within the discretion of the trial court. The plaintiffs claimed that the depositions were necessary to secure information not contained in the declarations. The trial court ruled in favor of the plaintiffs; and no abuse of discretion has been shown. (See *Simpson* v. *Gillis* (1934) 1 Cal.2d 42, 55 [32 P.2d 1071]; *Oak Grove School Dist.* v. *City Title Ins. Co.* (1963) 217 Cal.App.2d 678, 699 [32

Cal.Rptr. 288]; and *Horner* v. *Marine Engineers' etc. Assn.* (1959) 175 Cal. App.2d 837, 843-844 [1 Cal.Rptr. 113].) No error has been demonstrated in allowing the costs of the depositions.

The plaintiffs originally conceded that they were not entitled to the costs they had expended (one-half of the total) for the transcript of the proceedings at the hearing for the preliminary injunction. At the hearing to retax costs, the court equated the writing up of the prior testimony with the taking of depositions, and on that ground, it distinguished the rule, found in the authorities cited above, that there can be no recovery for the costs of a daily transcript unless ordered by the court. Plaintiffs' assertion that the parties agreed that the reporters' notes should be written up went unchallenged. Under these circumstances, and on the theory that the transcript was in lieu of further deposing those who testified at the earlier hearing, the trial court's ruling was upheld.

In affirming the judgment it should be pointed out that the mere planning for improvements which may have a disparaging effect on the value of a neighbor's property does not give use to an action for slander of title unless, as here, it is accompanied by evidence to sustain a false claim of right to use the neighbor's property for the purpose of effecting the planned improvement. Nor does every claim of right against the property of another give use to an action for slander of title with attendant damages as allowed in this case. The implied finding, warranted by the evidence, that the defendants were guilty of oppression, fraud, or express or implied malice in pressing their claims, elevated this case above the ordinary dispute over property rights involving two or more claimants.

The judgment is affirmed.

Molinari, P. J., and Elkington, J., concurred.