[Civ. No. 58146. Second Dist., Div. One. Aug. 15, 1980.]

FERRILL J. VOLPICELLI, Plaintiff and Respondent, v.
JARED SYDNEY TORRANCE MEMORIAL HOSPITAL et al.,
Defendants and Appellants.

Counsel

Memel, Jacobs, Pierno & Gersh, Steven L. Maler and Arthur R. Chenen for Defendants and Appellants.

William N. Byhower and Rotunno & Rotunno for Plaintiff and Respondent.

Opinion

**JEFFERSON (Bernard), Acting P. J.\***—More than two years after defendants terminated plaintiff physician's membership on the medical staff of defendant hospital, the superior court granted plaintiff's request for a preliminary injunction, ordering that he be given notice and hearing of the termination pursuant to the hospital's bylaws, and that he be temporarily reinstated to the medical staff pending the hearing. Defendants appeal from the order granting the preliminary injunction.

I

Plaintiff is an internist. In 1958, he became a member of the staff of defendant hospital and of two other hospitals in the Torrance community. Of the three hospitals, only defendant hospital is a "Burn Center," having facilities for treatment of burns. Plaintiff's membership on the staff of defendant hospital was continuous until 1976, when a dispute arose over his refusal to pay an increase in annual staff dues from $25 to $40. On October 12, 1976, the medical executive committee of the hospital "deleted" his membership on the staff for his failure to pay the dues, and notified him of the termination by letter dated November 10, 1976. On March 9, 1979, he filed in the superior court a complaint seeking an injunction and other relief.

Argument at the preliminary injunction hearing focused on two issues: (1) whether defendants afforded plaintiff notice and hearing, pursuant to the bylaws of defendant hospital, before terminating his membership; and (2) whether denial of reinstatement to the staff would result in irreparable injury to plaintiff. The trial court resolved each is-

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.

sue in favor of plaintiff, and made an order granting the preliminary injunction.[1]

## II

In seeking reversal of the preliminary injunction order, defendants advance the following contentions: (1) that plaintiff did not show irreparable injury; (2) that the "completed act" which terminated plaintiff's staff membership cannot be redressed by preliminary injunction; (3) that plaintiff's ultimate right to relief is "extremely doubtful" because he was "properly deleted" from the staff; (4) that by virtue of the preliminary injunction, the hospital and its patients will suffer greater hardship than plaintiff; (5) that plaintiff failed to exhaust all administrative remedies afforded by the hospital, and (6) that plaintiff is barred by laches.

## III

We first consider the standard of review on an appeal from an order granting a preliminary injunction—here mandatory rather than prohibitory in nature. ■ The granting of a preliminary injunction, even though the evidence with respect to the right therefor may be conflicting, rests in the sound discretion of the trial court and may not be disturbed on appeal except for an abuse of discretion. (*People v. Mobile Magic Sales, Inc.* (1979) 96 Cal.App.3d 1 [157 Cal.Rptr. 749].) The substantial evidence rule applies (*City and County of San Francisco v. Evankovich* (1977) 69 Cal.App.3d 41, 54 [137 Cal.Rptr. 883]), and we interpret the facts in the light most favorable to the prevailing party and indulge in all reasonable inferences in support of the trial court's order. (*MCA Records, Inc.* v. *Newton-John* (1979) 90 Cal.App.3d 18, 21 [153 Cal.Rptr. 153].) We deem it appropriate to point out, however, that the dissenting opinion simply ignores this standard of appellate review and proceeds at great length to usurp the trial court's function by weighing the evidence and determining the credibility of witnesses in order to find an alleged abuse of discretion.

---

[1] Written findings were not made and were not required to be made before entry of the preliminary injunction. (*People v. Mobile Magic Sales, Inc.* (1979) 96 Cal.App.3d 1, 12, fn. 4 [157 Cal.Rptr. 749].) Thus, our search is not for findings but rather for substantial evidence to support the exercise of the trial court's discretion. (*Ibid.*)

## IV

■ The nature of a physician's right to practice medicine within a hospital is not merely a personal right; it is a property interest which directly relates to the pursuit of his livelihood. (*Edwards* v. *Fresno Community Hosp.* (1974) 38 Cal.App.3d 702, 705 [113 Cal.Rptr. 579].) Such interest is clearly a fundamental right (*Anton* v. *San Antonio Community Hosp.* (1977) 19 Cal.3d 802, 823 [140 Cal.Rptr. 442, 567 P.2d 1162]). It is a generally accepted principle that a hospital's refusal to permit a physician to conduct his practice in the hospital, as a practical matter, may well have the effect of denying him the right to capably practice his profession. (*Edwards* v. *Fresno Community Hosp., supra,* 38 Cal.App.3d 702, 705.)

■ In the case before us, plaintiff had been a member of the staff of defendant hospital continuously for 18 years when defendants terminated his membership. Assuming that the termination was without notice and hearing, it is patently clear that plaintiff has been deprived of a valuable *right* without due process of law and that such deprivation of due process would, as the trial court noted, be irreparable. Defendants argue that the fact that plaintiff retained staff membership in two other hospitals precluded any harm to him from being irreparable. But this argument is illusory since plaintiff, as a physician, had a fundamental right to *fully* and *capably* practice his profession. Exclusion from one hospital out of three, with the one hospital being a burn center, certainly can bear substantially upon plaintiff's ability to fully practice his profession. As the trial court noted, defendant hospital had a *unique* burn center not available at the other hospitals.[2]

■ An explicit finding of irreparable harm is not required to sustain a preliminary injunction. (*Conover* v. *Hall* (1974) 11 Cal.3d 842, 850 [114 Cal.Rptr. 642, 523 P.2d 682].) ■ We conclude that there was sufficient showing of irreparable harm for issuance of the preliminary mandatory injunction herein.

---

[2]Defendants claim that plaintiff first raised the issue of the burn center by reply memorandum a few days prior to the preliminary injunction hearing and did *not* present evidence that he, as an internist, would treat burn patients. Oral argument at the hearing was directed to whether he would treat burns, in effect conceding that defendant hospital was a burn center. In their brief in this court, defendants do not dispute the fact that defendant hospital was a burn center. The trial court apparently inferred that an internist might treat a burn patient. On appeal, we view the facts most favorable to plaintiff and indulge in all inferences in support of the trial court's order.

■ Recent California decisions establish that before a public or private hospital may deny a doctor the right to practice his profession at that hospital, either by termination of existing staff privileges or by the denial of an initial application for such privileges, the hospital must provide a fair procedure which affords the doctor an opportunity to answer the "charges" upon which the exclusion rests. (*Westlake Community Hosp.* v. *Superior Court* (1976) 17 Cal.3d 465, 468 [131 Cal.Rptr. 90, 551 P.2d 410].)

In the instant case, the bylaws of defendant hospital set forth provisions for notice and hearing as to suspension, termination, or nonreappointment of a staff member. The bylaws provide, in pertinent part, that if a member has been *recommended* for termination by the medical executive committee, the member may request a hearing before a judicial review committee within 15 days after he has received notice of the recommendation. Further provisions set forth the procedure for a hearing by the judicial review committee, presided over by a hearing officer appointed by the governing board, to consider and act upon the recommendation of the medical staff executive committee.[3]

On October 7, 1976, the medical staff sent plaintiff a letter stating that on October 12, 1976, the executive committee would consider his nonpayment of dues under provisions of the bylaws setting forth that termination of appointment or change of status might be recommended by the committee because of his nonpayment of dues.[4]

On October 12, 1976 (as shown by minutes of a meeting set forth in a declaration by defendant hospital's staff coordinator), the medical executive committee, rather than making a recommendation, "deleted [plaintiff] from the Medical Staff of Torrance Memorial Hospital for failure to pay dues." Thus, plaintiff was deleted—that is, terminated— by the executive committee. This action by the executive committee thereby prevented plaintiff from utilizing the notice and hearing procedure provided in the bylaws which would have permitted plaintiff to obtain a review of the executive committee's action by the governing board of the defendant hospital.

---

[3]It appears undisputed that, under the bylaws, the executive committee *recommends*, and the governing board *acts* on the recommendation.

[4]The letter also stated, erroneously, that the bylaws provided that, upon termination, no new application for membership could be entertained for two years.

It is to be noted that defendants do not specifically claim that plaintiff was afforded the administrative notice and hearing procedure provided in the bylaws. Rather, they assert that plaintiff's termination was a "completed act" which could not legally be undone by way of preliminary injunction three years after the act. Defendants claim that the injunction was invalid because, in reality, it decided the merits of the action rather than preserving the status quo. In so doing, argue defendants, the mandatory preliminary injunction created a greater hardship to the hospital and its patients than to plaintiff.

In support of their "completed act" theory, defendants rely on *Allen v. Hotel & Restaurant etc. Alliance* (1950) 97 Cal.App.2d 343, 347-348 [217 P.2d 699], and *McManus v. KPAL Broadcasting Corp.* (1960) 182 Cal.App.2d 558, 563 [6 Cal.Rptr. 441]. These two cases announce the general rule that an injunction lies to *prevent* threatened injuries and has no application to *completed* wrongs for the redress of which a plaintiff is relegated to an action at law.

But the general rule or the rule of injunctive relief set forth in *Allen* and *McManus* is not without exceptions. A recognized exception to such rule is that an injunction may be granted with respect to "completed acts" if the wrongful acts involved are continued or repeated. (*Fretz v. Burke* (1967) 247 Cal.App.2d 741, 744 [55 Cal.Rptr. 879]; *Gold v. Los Angeles Democratic League* (1975) 49 Cal.App.3d 365, 372 [122 Cal.Rptr. 732].)

In the case at bench, one question presented is whether plaintiff could be fully redressed in an action at law for loss of, or serious damage to, his livelihood capacity by exclusion from use of the defendant hospital facilities. In addition, there was evidence presented that, after the medical executive committee had wrongfully deleted or terminated him from staff membership on October 12, 1976, defendants engaged in further acts directed toward continuing his exclusion from use of the defendant hospital. Thus, on November 10, 1976, a representative of the hospital sent plaintiff a letter stating that the executive committee had dropped him from the staff for his failure to pay dues. Upon receiving that November 10 letter, plaintiff requested a copy of the bylaws; but defendants refused the request. Absent a copy of the bylaws, plaintiff believed the erroneous statement in the medical staff letter sent to him on October 7, 1976, that, under the bylaws, he could not apply for reappointment to the staff for two years from the termination.

On November 3, 1977, plaintiff submitted an application for appointment to the staff, accompanied by letter stating that he would agree to appear before the credential committee to answer any questions bearing on his competency, but that he would not sign an exculpatory waiver attached to the application form, because, in his opinion, it would violate public policy. (See *Westlake Community Hosp.* v. *Superior Court, supra,* 17 Cal.3d 465, 480, holding that an exculpatory clause of such nature is invalid.) After an exchange of correspondence, plaintiff requested that his application for appointment (with refusal to sign the exculpatory claim) be accepted or denied, and that, if it were denied, he be given a hearing as provided by the bylaws. Defendants refused that request. In January 1978, plaintiff requested temporary privileges at the defendant hospital in order to admit for care two patients who specifically requested hospitalization therein. The request was denied, in part on the ground that he did not have a completed application on file (even though he had the aforementioned application on file, completed in all respects save execution of the exculpatory clause).

 Thus, the record discloses, without equivocation, that, following plaintiff's termination from his staff position, defendants continued a course of conduct toward plaintiff which can only be described as undue harassment to prevent his returning to the staff of the defendant hospital. Evidence of this course of conduct brings the instant case within the recognized exception to the rule that injunctive relief is not available to give redress to completed acts—the exception making injunctive relief available where the wrongful acts are repeated.

Nor is there merit to defendants' contention that the preliminary injunction was invalid for assertedly deciding the case on the merits and not preserving the status quo. The granting of a preliminary injunction—whether it be prohibitory or mandatory in nature—does not amount to an adjudication of the ultimate rights in controversy. (*West Coast Constr. Co.* v. *Oceano Sanitary Dist.* (1971) 17 Cal.App.3d 693, 702 [95 Cal.Rptr. 169]; *Continental Baking Co.* v. *Katz* (1968) 68 Cal.2d 512, 528 [67 Cal.Rptr. 761, 439 P.2d 889].) Here, the preliminary injunction was necessarily of limited scope; it merely ordered that plaintiff be given a hearing on his termination from membership upon 15 days notice, and that he be reinstated to the staff pending the hearing (a short time at best), a status he had for 18 years before being terminated without notice and hearing as required by the bylaws of the defendant hospital. If defendants provide the notice and hearing in compliance with the mandatory preliminary injunction, and if, as they

assert, plaintiff's right to relief at the hearing is extremely doubtful, plaintiff will only have been reinstated to staff membership for an extremely short period of time.

With respect to relative hardship, defendants claim that, if the hospital is required to admit plaintiff to the staff immediately without first having opportunity to review plaintiff's current medical skills, the hospital's patients will be potentially endangered; the hospital will be forced to violate regulations pertaining to licensure and regulations pertaining to the medicare program; and, without being able to "credential" plaintiff, the hospital could be subjected to potential malpractice liability; whereas (according to defendants), hardship to plaintiff is "nonexistent."

■ When the doctrine of relative hardship or balancing conveniences[5] is invoked as a defense to injunctive relief, proof of irreparable injury to defendant is a necessary element of the defense. (*Fairrington* v. *Dyke Water Co.* (1958) 50 Cal.2d 198, 200 [323 P.2d 1001].)

Defendants' arguments that an array of purported hardships would be visited upon them by the limited reinstatement of plaintiff to staff membership are untenable and completely lacking in merit. Reinstatement of plaintiff under the limited preliminary injunction ordered in this case provides plaintiff with access to defendant hospital's facilities that is no greater than the access granted in the defendant hospital's bylaws to uncredentialed physicians for temporary use of the facilities. Defendants' fears that plaintiff may lack competency can hardly be considered as put forth in good faith since plaintiff's credentials were satisfactorily reviewed periodically in the many years that he was a staff member before he was terminated; and during those years, and at the time of the trial court's granting of the preliminary injunction, he was a member in good standing of the staff of two other hospitals in the community which apparently had comparable facilities and standards of care. Thus, when any potential hardship to defendant hospital and its patients is balanced against the hardship to plaintiff in being denied his fundamental right to practice his livelihood fully and capably, the trial court could easily and properly balance the conveniences and comparative hardships in plaintiff's favor.

---

[5]The doctrine has been referred to in various terms, such as "relative hardship," "balancing conveniences," "balance of hardship." (See 7 Witkin, Summary of Cal. Law (8th ed. 1974) Equity, § 109, p. 5328.)

Finally, we review defendants' contentions that issuance of the preliminary injunction (1) was barred by laches; and (2) was barred by plaintiff's failure to exhaust administrative remedies. It is the position of defendants that, in the period after plaintiff was terminated from staff membership on the defendant hospital, he did not diligently seek relief through either administrative or judicial process.

■ The defense of laches requires unreasonable delay plus either acquiescence in the act about which plaintiff complains or prejudice resulting from the delay. (*Conti* v. *Board of Civil Service Commissioners* (1969) 1 Cal.3d 351, 359 [82 Cal.Rptr. 337, 461 P.2d 617].)[6] The defense of laches may be invoked only where refusal to do so would permit an unwarranted injustice to be done to the defendant. (*McCullough* v. *Jones* (1970) 11 Cal.App.3d 270, 276 [89 Cal.Rptr. 646].) In assessing the availability of this defense, each case must depend on its own facts. (*Hopson* v. *Nat. Union etc. Cooks, Stewards* (1953) 116 Cal. App.2d 320, 326 [253 P.2d 733].) Whether laches occurred in a particular case presents a question primarily for the trial court. An appellate court will not interfere with the trial court's discretion unless it is obvious that manifest injustice has been done, or unless the trial court's conclusions do not find reasonably adequate support in the evidence. (*Glass* v. *Gulf Oil Corp.* (1970) 12 Cal.App.3d 412, 433 [96 Cal.Rptr. 902].)

■ The doctrine of exhaustion of administrative remedies has not hardened into inflexible dogma. (*Ogo Associates* v. *City of Torrance* (1974) 37 Cal.App.3d 830, 834 [112 Cal.Rptr. 761].) It is excused where its pursuit would be futile, idle or useless (*Jacobs* v. *State Bd. of Optometry* (1978) 81 Cal.App.3d 1022, 1030 [147 Cal.Rptr. 225]), or would result in irreparable harm (*Ogo Associates* v. *City of Torrance, supra*, p. 834; Cal. Administrative Agency Practice (Cont.Ed.Bar 1970) § 4.69, p. 250.)

The record before us demonstrates that plaintiff made diligent efforts to retain his staff membership with the defendant hospital in the period after he was wrongfully terminated therefrom. These efforts were frustrated by defendants' conduct, resulting finally in plaintiff's filing of the herein action. We find no evidence to support the defense of laches. Is-

---

[6]It has been said that to bar the right to an injunction, the acquiescence must be such as proves plaintiff's assent to defendants' acts, and to the injuries that have flowed or can reasonably be anticipated to flow from those acts. (38 Cal.Jur.3d, Injunction, § 33, pp. 511-512.)

suance of the preliminary injunction was thus not barred by laches or plaintiff's failure to exhaust administrative remedies. We conclude that the trial court did not abuse its discretion in granting the injunction.

The order granting the preliminary injunction is affirmed.

Newman (J. M.), J.,* concurred.

**HANSON (Thaxton), J.**—I respectfully dissent.

The majority opinion has not only delivered to plaintiff/respondent Ferrill J. Volpicelli, M.D. (hereinafter plaintiff and/or Dr. Volpicelli) a "Pyrrhic victory"[1] but a victory which is not supported by the facts, the law or basic principles of equity.

I conclude that the court below abused its discretion in granting plaintiff the preliminary injunction and would vacate the order granting same. My reasoning is as follows:

BACKGROUND

The following somewhat detailed and lengthy chronology of events leading up to the litigation stage of the instant case is believed necessary in order to more accurately assess the legal and equitable positions of the parties.

*On October 7, 1976,* a member of the staff at the Jared Sydney Torrance Memorial Hospital (hereinafter defendant and/or Hospital) sent a letter to Dr. Volpicelli, who had been a member of the Hospital staff for some years, informing him that three notices had been sent to him and several telephone calls had been made to his office regarding his failure to pay medical staff dues. The letter also advised him that the medical executive staff of the Hospital would be considering his failure to pay dues at its October 12, 1976, meeting and that he could be terminated from the Hospital staff because of nonpayment of dues.[2]

---

*Assigned by the Chairperson of the Judicial Council.

[1]In 272 B.C. Pyrrhus, King of Epirus, won a victory over the Romans at the Battle of Asculum in Apulia at excessive cost. After the battle, King Pyrrhus said: "One more such victory and we are lost." Thus, the term a "Pyrrhic victory."

[2]Following is the content of the letter addressed to plaintiff dated October 7, 1976: "Dear Dr. Volpicelli,

*On October 12, 1976*, the Hospital received back the same letter it had sent to Dr. Volpicelli on October 7, 1976 (see fn. 2, *ante*), with the following words handwritten on the bottom of the letter:

"You mentioned all the available threats which don't concern or bother me—what interests me is you never mentioned what the dues were." The penned initials "FJV" were at the end of the above statement.

*On October 12, 1976*, the Hospital on its letterhead sent to Dr. Volpicelli the following notice and statement:

"FOURTH NOTICE
October 12, 1976
STATEMENT

"1976 Medical Staff Dues - - - - - - - - - - - - - - - - - - - - - - $ 40.00

"Exec. Committee

"Chief of Staff

"Please make check payable to: Torrance Memorial Hospital Medical Staff

"Return to: Medical Staff Secretary

"STAFF DUES ARE NOW OVERDUE"

Dr. Volpicelli responded to the above fourth notice and statement by typing across the face of the paper the following statement which he

---

"We have sent (3) notices for Medical Staff dues payment & have also telephoned your office regarding non-payment of dues. Executive Committee will be considering your name for non-payment of dues at its meeting on October 12, 1976.

"The Bylaws specify that: 'Termination of appointment, or change in status may be recommended by the Executive Committee under the following conditions: (j) Non-payment of dues. Following termination of appointments for the above conditions, no new application for membership will be entertained for two (2) years.'

"We are sure that this has been an oversight on your part, and would appreciate hearing from you by one of the following: (1) payment of dues, (2) letter requesting Leave of Absence, or (3) withdrawal from staff.

"Sincerely,
/s/ Doris A. Condit
"MEDICAL STAFF OFFICE"

signed and returned to the Hospital: "I have been a member of the hospital staff since 1959. It is most regrettable I must take a stand against T.M.H. singular policy of $40. annual dues. The money is totally unimportant, but when *all* other hospitals are at a $25., I consider it unscrupulous to charge almost twice as much. With the threat of being removed from staff I say such is the pity. There is ABSOLUTELY NO NEED FOR SUCH A PRACTICE AND IF I HAVE TO HOLD THE LINE IN PRICES WHY NOT T.M.H.

"SHOCKED,
/s/ F. J. Volpicelli"

*On November 10, 1976,* the Hospital notified Dr. Volpicelli in writing that he was dropped from the Hospital staff for failure to pay dues.[3]

(Dr. Volpicelli in his "Declaration in Support of Application for Preliminary Injunction" dated Feb. 28, 1979, under penalty of perjury, filed along with the underlying "Complaint for Declaratory Relief, Preliminary and Permanent Injunction and Damages" on Mar. 9, 1979, stated: "On or about November 10, 1976, I received notice by letter, a copy of which is attached hereto and marked as Exhibit A, that I had been removed from staff of Torrance Memorial Hospital for my failure to pay dues. This is the first notification I have any record of, and the first notice I received to my knowledge, that the staff dues were even due to be paid." Dr. Volpicelli then recites that because of his difficulty in obtaining a copy of the Hospital bylaws and his total dissatisfaction with the conduct of the Hospital staff and personnel, he embarked upon a program to obtain assistance in an effort to be reinstated to the medical staff at the Hospital by writing a letter to the Board of Medical Quality Assurance, the state Attorney General and state Senator Robert G. Beverly of the 27th District.)

*On March 23, 1977,* Senator Beverly requested of Attorney General Evelle J. Younger a formal written opinion on two questions, namely: (1) Under what legal authority can these mandatory staff dues be justi-

---

[3]The letter to Dr. Volpicelli advising him of his deletion from the medical staff roster was as follows:
"Dear Dr. Volpicelli:
"We regret to inform you it was necessary for the Executive Committee to take action to drop you from staff because of your failure to pay dues.
"We appreciate your past loyalty and support of Torrance Memorial Hospital.
"Sincerely,
/s/ Richard Hoffman, M.D.
"Secretary".

fied? and (2) can a physician be prohibited from practicing in a hospital, public or private, as a result of nonpayment of such dues?

*On June 8, 1977*, Attorney General Younger furnished Senator Beverly (opn. request No. CV 77/71 IL) a detailed opinion consisting of over six pages which concluded: "1. A medical staff has authority, in its bylaws, rules and regulations to require that its members pay reasonable dues for purposes relating to the legitimate activities of the medical staff.

"2. A physician can be prohibited from practicing in a hospital, public or private, for nonpayment of dues, provided the bylaws require dues. Further, if the bylaws require a hearing before a physician can be suspended or expelled for such nonpayment of dues, the physician is entitled to such a hearing."

In addition to the above conclusions the Attorney General's opinion contains the following statement: "If the bylaws require the payment of dues and the physician fails to pay his dues, it is reasonable for the Medical Staff to conclude that the physician no longer desires to be considered as a part of the Medical Staff. Since the physician's action is voluntary, he could, consistent with due process, be removed from the staff without a hearing."

*On November 3, 1977*, Dr. Volpicelli submitted a new application for appointment (reinstatement) to the Hospital's medical staff. However, he refused to sign a standard form-type authorization[4] needed by the Hospital to process his application on the ground that the "authorization [was] overly broad, and would require that [he] waive rights of [his] patients of a confidential nature. To comply with [the] authorization by attaching [his] signature thereto would, in [his] view, constitute a potential violation of [his] patients' right to privacy."

---

[4]The authorization read as follows: "I FULLY UNDERSTAND THAT ANY SIGNIFICANT MIS-STATEMENTS IN OR OMMISSIONS [*sic*] FROM THIS APPLICATION CONSTITUTE CAUSE FOR DENIAL OF APPOINTMENT OR CAUSE FOR SUMMARY DISMISSAL FROM THE MEDICAL STAFF. ALL INFORMATION SUBMITTED BY ME IN THIS APPLICATION IS TRUE TO MY BEST KNOWLEDGE AND BELIEF.

"In making this application for appointment to the Medical Staff of Torrance Memorial Hospital, I acknowledge that I have received and read the By-Laws of the Hospital and the By-Laws, rules and regulations of the Medical Staff of the Hospital, and that I am familiar with the principles and standards of the Joint Commission on Accreditation of Hospitals, the Guiding Principles for Physician-Hospital Relationships of the California Medical Association and the principles of medical ethics of the

*(The record shows that Dr. Volpicelli on Oct. 1, 1972, signed an authorization [exhibit D] identical to that quoted in fn. 4 which he now refuses to sign.)*

*On November 17, 1977,* Attorney Arthur R. Chenen sent the following letter to Dr. Volpicelli:

"Dear Dr. Volpicelli:

"This firm represents Torrance Memorial Hospital. Accordingly, we have been asked to reply to your letter of November 3, 1977 regarding

American Medical Association, and I agree to be bound by the terms thereof if I am granted membership or clinical privileges, and I further agree to be bound by the terms thereof without regard to whether or not I am granted membership or clinical privileges in all matters relating to the consideration of my application for appointment to the Medical Staff.

"By applying for appointment to the Medical Staff I hereby signify my willingness to appear for the interviews in regard to my application, authorize the Hospital, its Medical Staff and their representatives to consult with Administrators and members of Medical Staffs of other hospitals or institutions with which I have been associated and with others, including past and present malpractice carriers, who may have information bearing on my professional competence, character and ethical qualifications. I hereby further consent to the inspection by the Hospital, its Medical Staff and its representatives of all records and documents, including medical records at other hospitals, that may be material to an evaluation of my professional qualifications and competence to carry out the clinical privileges requested as well as my moral and ethical qualifications for staff membership; I hereby release from liability all representatives of the Hospital and its Medical Staff for their acts performed in good faith and without malice in connection with evaluating my application and my credentials and qualifications, and I hereby release from any liability any and all individuals and organizations who provide information to the Hospital, or its Medical Staff, in good faith and without malice concerning my professional competence, ethics, character and other qualifications for staff appointment and clinical privileges, and I hereby consent to the release of such information.

"I hereby further authorize and consent to the release of information by this Hospital, or its Medical Staff, to other hospitals, medical associations and other interested persons on request regarding any information the Hospital and the Medical Staff may have concerning me as long as such release of information is done in good faith and without malice, and I hereby release from liability this Hospital and its Medical Staff for so doing.

"I understand and agree that I, as an applicant for Medical Staff membership, have the burden of producing adequate information for proper evaluation of my professional competence, character, ethics and other qualifications and for resolving any doubts about such qualifications.

"I pledge myself to shun unwarranted publicity, dishonest money-seeking and commercialism; to refuse money trades with consultants, practitioners, makers of surgical appliances and optical instruments, or others; to teach the patient his financial duty to the physician and to expect the practitioner to obtain his compensation directly from the patient; to make my fees commensurate with the service rendered and with the patient's rights; and to avoid discrediting my associates by taking unwarranted compensation."

your inability to sign the standard form application because of your concern about a possible waiver of your patient's rights to confidentiality and privacy.

"The hospital understands and, in fact, shares your concern with confidentiality of the patient records. Moreover, you can be assured that the hospital is fully cognizant of the law with respect to the confidentiality of patient records and under no circumstances would the hospital ever seek to obtain access to patient records without obtaining the consent of the patient, if required.

"The authorization you have been asked to sign seeks only your consent to the review of these records to the extent that it is necessary. The authorization could not be, nor does it purport to be, an authorization by you to review patient records without the necessary consent of the patient.

"I hope the foregoing resolves any problem you might have with the Torrance Memorial Hospital staff application form and that you will now be able to sign the document in its present form, since the hospital cannot process your staff application until it receives a fully executed authorization.

"If you have any questions in connection with the foregoing, please do not hesitate to contact me.

"Very truly yours,

"/s/ ARTHUR R. CHENEN"

*On December 19, 1977*, Mr. Chenen, following an exchange of correspondence with Dr. Volpicelli, sent the following letter: "Re: Application for Staff Membership/Torrance Memorial Hospital

"Dear Dr. Volpicelli:

"This will acknowledge receipt of your letter, dated December 8, 1977, regarding the above-captioned matter. In your letter of November 3, 1977, you raised questions as to whether execution of the application form could be construed as a waiver of your patients' rights of confidentiality. My letter to you, dated November 17, 1977, con-

tained assurances that that was not the hospital's intention and that the language of the application form could not be so interpreted.

"Then, during a telephone conversation, you indicated that the application form recites that the physician applying for membership was familiar with certain material. You complained that the hospital had not made this material available to you. Although it is not the hospital's obligation to make this material available to you, it has now been provided or made available to you. Although there seems to be some misunderstanding as to what you were told regarding this material, since the material is now available, any confusion is moot.

"In light of the foregoing, I do not understand the basis for your continued refusal to execute the application for staff membership as required by the hospital's by-laws. I must respectfully disagree with your opinion that execution of the membership application form may not be required as a condition for membership on the medical staff at Torrance Memorial Hospital. As I have previously indicated to you, your application cannot, and will not, be processed by the hospital until such time as it is complete, including the execution of the application form. Accordingly, your request that the hospital proceed with your application to approval or denial must be refused.

"Very truly yours,

"/s/ ARTHUR R. CHENEN"

*On January 9, 1978*, Dr. Volpicelli, on his prescription form, sent the following note to the medical staff secretary:

"Medical Staff Secretary:

"Please let me have the necessary forms for temporary privileges as required by Section 3.8 (b), subsection (ii) on the 'Care of Specific Patients', as per the By-Laws of Torrance Memorial Hospital. Thank you.

"/s/ F. J. Volpicelli, M.D."

*On January 13, 1978*, by letter Dr. Stephen R. Lemkin, Chief of Staff, responded to Dr. Volpicelli's application for temporary privileges at the Hospital as follows:

"Dear Dr. Volpicelli:

"In response to your request for formal notification of our phone discussion today regarding your temporary privileges at Torrance Memorial Hospital, I would respond as follows:

"Referring you to section 3.8 of the Bylaws and Rules and Regulations of the Medical Staff at Torrance Memorial Hospital, temporary privileges are granted generally under three circumstances. The first is an emergency privilege in which the patient would experience serious or permanent harm if there was any delay in administering treatment. Secondly, The Chief of Staff may grant temporary privileges if an application is pending. Thirdly, The Chief of Staff may grant temporary privileges for the individual care of specific patients in special circumstances as determined by The Chief of Staff. Since you told me that the patients in question do not involve any special circumstances other than their own specific desire to be admitted to Torrance Memorial Hospital, I feel there is no need to grant such temporary privileges. Since we do not have a completed application pending for your appointment, there are no grounds for such a granting of privileges under these circumstances as well. This letter is not to be construed to suggest that your application for privileges would be unfavorably reviewed, but until we have such a completed application, our Credentials Committee is unable to act upon your formal application.

"Sincerely yours,

"/s/ Stephen R. Lemkin, M.D.
"Chief of Staff"

*On January 26, 1978,* Dr. Volpicelli wrote to a Mr. Graham of the Hospital a letter "Re: Denial of hearing on application to staff" stating his position and requesting that his application for utilization of Hospital facilities be processed forthwith to acceptance or denial; and in the event of denial, to grant a hearing on such denial where any disputed issues (including, but not limited to, the matter of the General Waiver) as to the legitimacy of the existing requirements for utilization of Torrance Memorial Hospital facilities may be fully explored while creating a record susceptible of independent evaluation by a court of competent jurisdiction. A copy of the above letter was also sent to Mr. Chenen, counsel for the Hospital, Dr. S. R. Lemkin, Chief of Staff, and Dr. L. J. Burman, Chairman of the Credentials Committee.

*On February 2, 1978*, Attorney Chenen responded to Dr. Volpicelli by letter as follows:

"Dear Dr. Volpicelli:

"This will acknowledge receipt of your letter dated January 26, 1978, addressed to George Graham, Administrator of Torrance Memorial Hospital.

"I will not, at this time, respond in detail to the various statements contained in your letter. I believe it is sufficient to say that the hospital cannot, and will not, process your application for staff privileges until such time as a completed application form, including signature, has been received.

"Very truly yours,

/s/ ARTHUR R. CHENEN"

*On March 9, 1979*, Dr. Volpicelli, who had apparently been conducting his running gun battle with the Hospital without the aid of counsel, retained counsel who filed the underlying complaint upon which this appeal is based.

*On June 26, 1979*, the trial court by its "Order for Preliminary Injunction" made, in relevant part, the following order from which the Hospital takes this appeal: "IT IS ORDERED THAT the Plaintiff, Ferrill J. Volpicelli, M.D., be granted a hearing on his deletion from membership of the Jared Sydney Torrance Memorial Hospital in 1976. Said hearing shall be scheduled upon fifteen (15) days notice to the plaintiff, pursuant to the terms of the Hospital Bylaws.

"Pending a hearing pursuant to the bylaws in effect in 1976, Defendant Hospital is ordered to reinstate plaintiff and is enjoined from deleting plaintiff from its Medical Staff, and he is hereby reinstated to the Medical Staff pending said hearing."

ISSUES

The trial court order is limited to reinstatement of Dr. Volpicelli to the Hospital staff *for the sole purpose of granting him a hearing* on his deletion from the medical staff on November 10, 1976, for failure to

pay dues. Accordingly, I need not address the dispute between Dr. Volpicelli and the Hospital coupled with the doctor's refusal to sign the authorization attached to his new application submitted a year later on November 3, 1977.

Focusing on the November 1976 termination of Dr. Volpicelli from the Hospital medical staff, in my opinion the central and determinative issue is whether or not Dr. Volpicelli was denied due process when he was terminated for failure to pay his dues. Clearly, the trial court also focused on this aspect of the case as evidenced by the reporter's transcript[5] and the wording and limited nature of the order granting the preliminary (mandatory) injunction. (See *ante.*)

Moreover, the majority opinion herein refers to the due process issue when it states: "Assuming that the termination was without notice and hearing, it is patently clear that plaintiff has been deprived of a valuable *right* without due process of law and that such deprivation of due process would, as the trial court noted, be irreparable." (Italics added.)

The majority opinion in concluding the trial court did not abuse its discretion in granting the mandatory injunction stated: "The record before us demonstrates that plaintiff made diligent efforts to retain his staff membership with the defendant hospital in the period after he was wrongfully terminated therefrom. These efforts were frustrated by defendants' conduct, resulting finally in plaintiff's filing of the herein action. We find no evidence to support the defense of laches. Issuance of the preliminary injunction was thus not barred by laches or plaintiff's failure to exhaust administrative remedies."

My review of the record leads me to an opposite conclusion, namely that the "diligent" efforts of plaintiff were misdirected in that he failed to exhaust the administrative remedies available to him within the time and in the manner provided under the bylaws; that he was not denied

---

[5]The reporter's transcript contains the following colloquy between counsel for the defendant Hospital and the court:

"MR. CHENEN: If we give him a hearing the issue will be whether he paid dues, and, if not, whether he had a justification for not paying them.

"THE COURT: I am not going to consider that. He had to have a hearing on this dues question back in '76. I am saying he didn't have due process at that time. I am giving him due process. After the hearing you take a position he is off the staff. The issue is joined.

"On the other hand, if he pays the dues and is on staff, you can do whatever you want."

due process; and that the issuance of the preliminary injunction was barred by the doctrine of laches.

DISCUSSION

I

PLAINTIFF WAS NOT DENIED DUE PROCESS AND FAILED TO EXHAUST ADMINISTRATIVE REMEDIES

Procedural due process is not frozen into a draconian like code. The multitude of different factual situations present in the real world does not permit an inflexible process which could be universally applied in all cases. It is the substance of the right that is of vital importance, not the form of the procedure.

While some legal scholars view procedural due process as an elusive concept, the elusiveness to a great extent evaporates when each factual situation is analyzed in light of its basic essential elements. *In brief, procedural due process basically requires (1) that the parties must have _reasonable notice_ and (2) an _opportunity for a fair hearing_.* (The latter element necessarily includes such rights as the right to produce evidence and cross-examine adverse witnesses and the right to counsel and to appear before an impartial tribunal.)

*Reasonable Notice*: Applying the above basic elements of due process to the facts of the case at bench, it is clear that not only did Dr. Volpicelli have *"reasonable notice"* of his termination as a staff member at the Hospital but that he had *"actual notice"* of same. Although Dr. Volpicelli in his declaration under oath dated February 28, 1979, in support of his complaint stated that the letter dated November 10, 1976, terminating him was the first notification that staff dues were even due to be paid, the hard uncontradicted documentary evidence is to the contrary. His cryptic note scrawled on the Hospital's letter dated October 7, 1976, and received by the Hospital on October 12, 1976 (see p. 255, *ante*), was his first written salvo indicating that he was ready to do battle with the Hospital. His typed response to the Hospital's fourth notice (see p. 255, *ante*) was a declaration of war stating that as a matter of conscience he did not intend and would not pay the $40 annual dues (which included the $15 annual increase in dues). We are not here concerned with a matter of the plaintiff's personal conscience but with his duties and responsibilities as a member of the Hospital staff to com-

ply with legally constituted bylaws of the Hospital in the same manner as all other staff members are required to do.

*Opportunity for a Fair Hearing*: In respect to the second basic due process requirement of "an *opportunity* for a fair hearing," the key word in the context of the instant case is *"opportunity."* According to the record defendant Hospital's bylaws provided for internal remedies and procedures for seeking reconsideration of his termination for failure to pay his dues if he had desired to challenge his deletion from the medical staff.

Section 3.7, subdivision (b), of the bylaws pertaining to active medical staff members provides: "In all cases in which a member's appointment has been recommended for suspension, termination or non-reappointment by the Medical Executive Committee, the member has the right to seek reconsideration of his case. A member may do so by making a *written request* to the Secretary of the Medical Staff *within fifteen* (15) *days after the member has received notice of the recommendation or actions* which he seeks to have reconsidered. Said request may include a request for an informal conference with the Medical Executive Committee at their next scheduled meeting." (Italics added.) Following this provision there is set out an elaborate and fair procedure for conducting such hearings.

Here, Dr. Volpicelli seeks to attack the Hospital's "action" of terminating his membership on the medical staff for failure to pay dues. He had 15 days after he received notice by the November 10, 1976, letter to submit a "written request" for reconsideration which he did not do. Plaintiff seeks to excuse his inaction by asserting that the Hospital would not supply him a copy of the bylaws but does not supply specific dates when he made an effort to obtain a copy. However, as a member of the medical staff he is not only presumed to have knowledge of the contents of the bylaws but as noted on October 1, 1972, he signed an authorization (exhibit D) which contains the statement, "I acknowledge that I have received and read the By-Laws of the Hospital and the By-Laws, rules and regulations of the Medical Staff of the Hospital,... and I agree to be bound by the terms thereof if I am granted membership or clinical privileges,... " Moreover, there is no showing whatsoever that he made an effort to obtain another copy of the bylaws within the 15-day time period when his "written request" had to be submitted to the secretary of the medical staff.

In short, the record shows that plaintiff never desired nor requested an appeal hearing as provided by the bylaws and voluntarily waived his rights to such a hearing. Neither California law, the Attorney General's opinion nor the Hospital medical staff bylaws require a hearing with regard to membership termination for failure to pay dues, *if no hearing is requested.*

Accordingly, I would hold that plaintiff in the instant case was not denied due process and failed to exhaust the administrative remedies afforded him by the Hospital's bylaws and is foreclosed from judicial relief. In *Westlake Community Hosp.* v. *Superior Court* (1976) 17 Cal.3d 465 [131 Cal.Rptr. 90, 551 P.2d 410], the court said at page 469: "*[B]efore a doctor may initiate litigation challenging the propriety of a hospital's denial or withdrawal of privileges, he must exhaust the available internal remedies afforded by the hospital.* . . [T]his exhaustion of remedies principle has long been applied in suits attacking the actions of comparable 'private associations' and we conclude that the doctrine applies when a doctor sues in tort for monetary damages as well as when he seeks a judicial order compelling reinstatement or admission." (Italics added.)[6]

## II

IRREPARABLE INJURY TO PLAINTIFF (DR. VOLPICELLI) NOT SHOWN

"The remedy by [preliminary] injunction is summary, peculiar and extraordinary and it ought not to be issued except for the prevention of great and irreparable injury." (*Pellissier* v. *Whittier Water Co.* (1922) 59 Cal.App. 1, 6 [209 P. 493].)

"*To entitle a plaintiff to injunctive relief the burden is upon him to prove actual or threatened injury and a court may not infer this from mere proof of acts intended* to harm. This omission is not cured by the general statements of the complaint 'that great and irreparable injury will result' from the acts described by the pleader. It has always been the rule in this state that such averments, standing alone, have no pro-

---

[6]In *Westlake* the court allowed the plaintiff doctor to institute a damage action for denial of staff privileges because the defendant hospital failed to provide plaintiff with any internal administrative remedies which had been or could be exhausted.

In the instant case unlike in *Westlake* defendant Hospital had provided elaborate and fair internal administrative procedure for reconsideration of his termination which Dr. Volpicelli could have taken advantage of if he had desired to do so.

bative force and cannot be made the basis for injunctive relief. Facts concerning the irreparable injury which, it is asserted, will result to the complainant unless protection is extended to him must be pleaded in order that the court may consider whether his apprehensions are well founded. A mere allegation that such injury will result is not sufficient. [Citations.] A complaint for an injunction which alleges only general conclusions, not warranted by any pleading of facts, does not state a cause of action to enjoin the acts complained of." (*E. H. Renzel Co. v. Warehousemen's Union* (1940) 16 Cal.2d 369, 373 [106 P.2d 1], italics added.)

Here, Dr. Volpicelli has not set forth adequately facts showing he will be irreparably harmed by the failure to issue a preliminary injunction. He has not been a member of defendant Hospital's medical staff for over three years during which time he has been a staff member and has had access to two other general, acute care hospitals in the Torrance area (South Bay Hospital and Little Company of Mary Hospital) with facilities comparable to those of defendant Hospital.

As what appears to be an afterthought to bolster his claim of irreparable injury, he alludes to defendant Hospital's sophisticated burn treatment facilities which are not available in the two other hospitals in the area. However, plaintiff failed to introduce any evidence that he was then treating serious burn patients or that he ever has treated serious burn patients or that he was likely to treat serious burn patients in the near future. Moreover, plaintiff failed to demonstrate that he has the medical expertise or qualifications, *as an internist*, to treat patients with burns of the degree that warrant care in the sophisticated burn treatment facilities of defendant Hospital. A preliminary injunction cannot issue on the basis of sheer speculation that Dr. Volpicelli, an internist, "could get" a burn patient. Moreover, if in fact Dr. Volpicelli did get a burn patient and wished to use the specialized burn facilities at the Hospital, he could quickly apply for temporary privileges under section 3.8, subdivision (b), of Hospital's bylaws of which he is personally aware (see his memorandum dated Jan. 9, 1978, at p. 260, *ante*) as an emergency privilege (see Dr. Lemkin's letter dated Jan. 13, 1978, at p. 261, *ante*).

The court below apparently completely ignored the potential liability that could be realized by defendant Hospital and the demonstrated hardship it would suffer by reason of issuance of the mandatory preliminary injunction under the unique facts of the case at bench.

Moreover, it is clear that the balancing of the relative inconvenience and hardships imposed upon the parties by the granting or denial of a mandatory preliminary injunction is of great importance. (See *Vesper* v. *Forest Lawn Cemetery Association* (1937) 20 Cal.App.2d 157 [67 P.2d 368]; *McCarty* v. *Macy & Co.* (1959) 167 Cal.App.2d 164 [334 P.2d 156].)

Reinstatement of Dr. Volpicelli to the Hospital staff, as ordered, *after a three-year absence without a current review of his medical expertise and skills* could not only potentially endanger the Hospital's patients but subject it to being named as a defendant in possible malpractice actions by violating regulations[7] promulgated to protect the health and safety of patients.

Finally, plaintiff's reliance on the cases of *Anton* v. *San Antonio Community Hosp.* (1977) 19 Cal.3d 802 [140 Cal.Rptr. 442, 567 P.2d 1162], and *Westlake Community Hosp.* v. *Superior Court, supra,* 17 Cal.3d 465, is misplaced. Unlike the case at bench, neither the *Anton* nor *Westlake* case involved preliminary injunctions. Those cases involved actions by physicians seeking judicial redress for staff

---

[7]Defendant Hospital, like all other hospitals in the State of California, is required by law to conduct regular peer review of its medical staff. Regulation 70701 of title 22 of the California Administrative Code, which governs the licensure of hospitals, provides in relevant part: "(a) The governing body shall:

". . . . . . . . . . . . . . . .

"(6) Require that the medical staff establish controls that are designed to ensure the achievement and maintenance of high standards of professional ethical practices including provision that *periodically all physicians may be required to demonstrate their ability to perform surgical and other procedures competently and to the satisfaction of an appropriate committee or committees of the staff.*" (Italics added.)

Defendant Hospital is also a participant in the Medicare Program. The conditions for participation in the Medicare Program are found at 42 Code of Federal Regulations section 405.1023 (1979) and require: "The hospital has a medical staff organized under bylaws approved by the governing body, and responsible to the governing body of the hospital for the quality of all medical care provided patients in the hospital and for the ethical and professional practices of its members.

". . . . . . . . . . . . . . . .

"(d) Staff appointments are made by the governing body, taking into account recommendations made by the active staff. The factors explaining the standards are as follows:

"(1) The governing body has the legal right to appoint the medical staff and the moral obligation to appoint only those physicians who are *judged by their fellows* to be of good character and *qualified and competent* in the respective fields.

"(2) Reappointments are made periodically, and recorded in the minutes of the governing body. Reappointment policies provide for *periodic appraisal of each member of the staff,* including consideration of his physical and mental capabilities. . . ." (Italics added.)

membership terminations immediately after the hospitals in question had acted to terminate such memberships. Here, plaintiff seeks immediate reinstatement by preliminary injunction after failing to bring any action for administrative or judicial redress for a number of years.

### III

THE MANDATORY PRELIMINARY INJUNCTION DOES NOT PRESERVE THE "STATUS QUO" AND ULTIMATE RELIEF IS EXTREMELY DOUBTFUL

In *Allen* v. *Hotel & Restaurant etc. Alliance* (1950) 97 Cal.App.2d 343 [217 P.2d 699], the plaintiffs sought a preliminary injunction based upon their contention that they had been expelled from defendant union without due process. The trial court's order, quite similar in many respects to the instant case, provided, in relevant part, as follows: "[Defendants are ordered to desist and refrain] 'from doing or attempting to do any of the following described acts alleged to have been done by plaintiffs, or any of them, prior to December 30, 1947.' . . .

" . . . . . . . . . . . . . . . .

"'(2) From expelling or purporting to expel plaintiffs, or any of them, from [defendant union] . . .

"'(3) From giving effect in any way or by any means whatsoever to the purported orders of expulsion against plaintiffs . . . and said orders of expulsion for the purposes of this order are hereby declared to be suspended.

" . . . . . . . . . . . . . . . .

"'(5) From refusing to accept dues . . . from plaintiffs . . . upon the same terms and conditions as all other members in good standing of [defendant union]. The purpose of this provision is to restore plaintiffs to the membership and dues status they enjoyed in said Unions prior to the purported expulsion orders of December 30, 1947, and to protect

their property rights and benefits in the Union.'" (97 Cal.App.2d at pp. 345-346.)

The Court of Appeal reversed the trial court, explaining: "'an injunction lies only to prevent threatened injury and has no application to wrongs which have been completed, for the redress of which a party is relegated to an action at law. Clearly, such wrongs cannot be corrected by a temporary injunction, the usual purpose of which is to preserve conditions as they are until after trial and judgment, although the facts may be such as to entitle the complainant to permanent relief.'" (97 Cal.App.2d at p. 347.)

The *Allen* court further held that a court cannot by preliminary injunction decide the merits of the underlying action. The court stated as follows: "'*The granting or denial of a preliminary injunction does not amount to an adjudication of the ultimate rights in controversy.* It merely determines that the court, balancing the respective equities of the parties, concludes that, pending a trial on the merits, the defendant should or that he should not be restrained from exercising the rights claimed by him. When the cause is finally tried, it may be found that the facts require a decision against the party prevailing on the preliminary application.' [Citing *Miller & Lux* v. *Madera Canal etc. Co.*, 155 Cal. 59, 62-63.]

". . . . . . . . . . . .

"*Whatever might be done later on by a final judgment, it is clear that the court could not, by this preliminary injunction* [italics in original] *. . . declare a suspension of the expulsion orders which had been made almost two months before*, nor restore plaintiffs 'to the status of membership in good standing they enjoyed and possessed' prior to December 30, 1947, without violating the settled rules of all these cases." (97 Cal.App.2d at p. 348, italics added; see also *McManus* v. *KPAL Broadcasting Corp.* (1960) 182 Cal.App.2d 558, 563 [6 Cal. Rptr. 441] ["Obviously, a completed wrong cannot be corrected by a preliminary injunction, the purpose of which is to preserve the *status quo* until after final judgment, though the facts be such that the plaintiff is entitled to some form of permanent relief."].)

The similarities between the trial court's order reversed in *Allen* and the trial court's order in the instant case are striking. The trial judges in *Allen* and in the case at bench issued orders which reinstated the respective plaintiffs' membership rights subsequent to the revocation of such rights. In *Allen* the trial court improperly vacated an expulsion order of defendant union which was issued a mere two months following the expulsion. Here, the order is an even more serious abuse of discretion than the order of the *Allen* trial judge because it undoes an act that was completed over three years ago. Moreover, the *Allen* plaintiffs' property rights and "right to livelihood" probably suffered great damage by the failure of the injunction to issue in that they would not be able to obtain union shop jobs without their union memberships. Here, plaintiff has been practicing medicine for the past three years and has had access to hospitals in the Torrance area which are comparable to defendant Hospital. Furthermore, plaintiff was not and has not been barred from membership, as was the case for the *Allen* plaintiffs. He could have reapplied for membership simply by preparing and executing the staff application in proper form.

It is also fundamental equitable doctrine that "[*a*] *preliminary injunction will not issue in a doubtful case*; the denial of a preliminary injunction is amply justified where it is doubtful what the outcome may be on a final hearing of the cause." (*Thayer Plymouth Center, Inc.* v. *Chrysler Motors Corp.* (1967) 255 Cal.App.2d 300, 305 [63 Cal.Rptr. 148], italics added; see also *Paramount Pictures Corporation* v. *Holden* (S.D.Cal. 1958) 166 F.Supp. 684, 694.)

While the order of the court below is of a very "limited" scope, it does reinstate plaintiff to defendant Hospital's medical staff and in doing so decided a key issue of the underlying action, i.e., whether plaintiff was improperly terminated from the medical staff for failure to pay his annual dues and upset the "status quo" of the past three years.

Moreover, the order subjects defendant Hospital to an additional pointless, expensive, time consuming and useless act by requiring an administrative hearing, the outcome of which is extremely doubtful. The reporter's transcript reflects that the court acknowledged this fact by the following statement: "THE COURT: It seems to me the worst that could happen is maybe one or two patients get admitted during this pe-

riod you hold your 15-day hearing, and *you will give him his hearing and you will drop him and the issue will be joined.*" (Italics added.)

Thus, the trial court's preliminary injunction order compels a totally useless act. There is no dispute that plaintiff failed to pay medical staff dues. The Attorney General's opinion establishes that he had no justification for said failure. The trial court acknowledged the inevitable result of any new hearing to replace the one that plaintiff waived. The court in so doing abused its discretion and should have upheld Dr. Volpicelli's termination for failure to pay his dues in 1976 and addressed the issue of the propriety of defendant Hospital's refusal to process plaintiff's current application which was already properly before the trial court.

IV

THE ISSUANCE OF A PRELIMINARY INJUNCTION IS BARRED BY THE DOCTRINE OF LACHES

The record indicates, as hereinbefore described in some detail, that plaintiff was incensed by a $15 increase in the Hospital medical staff dues and embarked on a voluntary course of conduct which resulted in his deletion from the medical staff. The correspondence between defendant Hospital and Dr. Volpicelli in 1976 illustrates that plaintiff was clearly on notice: (1) That he had failed to pay dues; (2) that the Hospital medical staff's bylaws provided that membership could be terminated because of nonpayment of dues; (3) that the medical executive committee of Hospital's medical staff was considering plaintiff's nonpayment of dues at its October 12, 1976, meeting; and (4) that on November 10, 1976, plaintiff was notified in writing that he was dropped from the Hospital medical staff.

Plaintiff was apparently not interested in an administrative hearing. In response to defendant's fourth notice regarding delinquent dues, he indicated that he did not care if he were to be deleted from the staff for failure to pay dues when he said: "With the threat of being removed from staff, I say such is the pity." Plaintiff apparently wanted to make an issue of the $40 dues assessment and therefore went on his crusade to dispute the $15 dues increase with various medical associations, the state Legislature and the California Attorney General. Having failed in his efforts to invalidate the dues requirement as provided by the bylaws

through outside agencies, he brought the underlying action seeking to resurrect administrative remedies which he knowingly or negligently waived over three years ago.

In *Conti v. Board of Civil Service Commissioners* (1969) 1 Cal.3d 351 [82 Cal.Rptr. 337, 461 P.2d 617],[8] the court at page 359 stated the rule regarding laches as follows: "The defense of laches requires unreasonable delay plus either acquiescence in the act about which plaintiff complains or prejudice to the defendant resulting from the delay...." (Fns. omitted.)

In *Los Angeles Athletic Club v. Long Beach* (1932) 128 Cal.App. 427 [17 P.2d 1061], the plaintiff sought an injunction to order defendant city to abate a breakwater which allegedly caused waters to undermine plaintiff's club building. The appellate court held, in part at page 433, that injunctive relief was improper on the basis of laches, in that: "[A]ppellant stood by and did nothing during the entire course of construction and for over six months after the completion of the work sought to be abated."

Here, plaintiff (Dr. Volpicelli) waited over two years to seek judicial relief. He knew of the administrative remedies available to him under defendant Hospital's bylaws and voluntarily waived them. The record indicates that he purposely did not pay his dues and invited termination from the staff in order to fight the dues increase through agencies outside those procedures provided in the bylaws. The unreasonable delay in seeking judicial relief has prejudiced defendant Hospital in that, as defense counsel asserts in his brief, "records have been lost, employees have moved, and memories have no doubt faded in the three year interim.... For example, Plaintiff claims he requested a copy of the [Hospital] Medical Staff by-laws and was told they were unavailable. It will probably be difficult, if not impossible, for [Hospital] to locate witnesses to refute this claim after three years."

---

[8]The *Conti* case involved a situation in which the trial court granted a writ of mandate ordering the defendant board to reinstate plaintiff to his job with a city agency. The defendant board contended that plaintiff's delay of approximately 11 months from the time of his exhaustion of his administrative remedies until the filing for relief was unreasonable and prejudicial. The Supreme Court held that no evidence was introduced to support a finding that the delay was excusable and reversed the trial court and remanded the case for a determination as to whether laches barred plaintiff's action.

## DISPOSITION

For the reasons stated, I would vacate the trial court's order for a mandatory preliminary injunction and leave the parties where we find them, each to bear his or their own costs.[9]

---

[9]In the case at bench plaintiff apparently objected to paying the $15 annual dues increase as a matter of personal conscience and to help fight inflation. In this effort although he initially was not represented by counsel after painting himself into a corner he retained counsel which undoubtedly resulted in an expenditure of attorney's fees far in excess of the $15 annual increase in dues. In addition he forced the Hospital to retain counsel and expend large sums in attorney's fees to defend and protect the integrity of the Hospital's bylaws and medical staff. In addition, since the Hospital is not an eleemosynary institution, it undoubtedly had to pass the legal expenses it incurred along to plaintiff's colleagues on the medical staff or to the patients who utilize the Hospital facilities. Moreover, large sums of public funds have been expended in support of the court facilities utilized during the litigation phase. The bottom line is that not only has plaintiff been denied Hospital medical staff privileges for a period of time but inflation has been increased rather than decreased.